INTERNATIONAL MULTIFOODS CORP. Plaintiff,

v.

COMMERCIAL UNION INSURANCE COMPANY and Insurance Company Of North America Defendants.

Insurance Company Of North America, Third–Party Plaintiff,

v.

Astep Corporation, Ascop Corporation, M/V Ozark, her engines, boilers, tackle, etc., in rem, Eratira Navigation Co., Ltd., Eastwind Transport Ltd., Van Weelde Chartering B.V., Riomar Agencies, Inc., and Rok, LLC, Third–Party Defendants.

Commercial Union Insurance Company, Third–Party Plaintiff,

v.

M/V OZARK, her engines, boilers, tackle, etc., in rem, Eratira Navigation Co., Ltd., Eastwind Transport Ltd., Van Weelde Chartering B.V., and Riomar Agencies, Inc., Third–Party Defendants.

No. 98CIV.4469(AKH).

United States District Court, S.D. New York.

June 1, 2000.

Paul D. Friedland, White & Case, L.L.P., New York, NY, for International Multifoods Corp.

Stacey Tranchina, Bigham, Englar, Jones & Houston, New York, NY, for Commercial Union Ins. Co.

Anthony J. Pruzinsky, Hill Rivkins & Hayden LLP, New York, NY, for Insurance Co. of North America.

Gary Lee Garrett, Zukerman, Gore & Brandeis, New York, NY, for Ascop Corp.

Peter Skoufalos, Lyons, Skoufalos, Proios & Flood, New York, NY, for Eratira Navigation Co., Ltd., Eastwind Transport Ltd.

Frank A. Atcheson, Clark & Atcheson, New York, NY, for Van Weelde Chartering B.V.

Kurt Lee Weinmann, Garbarini & Scher, P.C., New York, NY, for Riomar Agencies, Inc.

*MEMORANDUM AND ORDER ON RE-CONSIDERATION (Construing War Risk Exclusion to All–Risk Insurance Coverage)*

HELLERSTEIN, District Judge.

I have been asked to resolve a dispute about an issue of insurance coverage: whether parol evidence of alleged custom and usage may be admitted to contradict the plain meaning of a war risk exclusion clause. Plaintiff International Multifoods ("IMF"), a Minnesota corporation, is in the business of selling frozen meat. Pursuant to a contract with ASCOP Corp., a New York corporation, IMF shipped product from Pascagoula, Mississippi to St. Petersburg, Russia aboard the M/V Ozark. On arrival in St. Petersburg, on or about September 14, 1997, the cargo was seized by the St. Petersburg police incident to an investigation of black-marketing, bribery and customs evasion, and has not been recovered.

Commercial Union Insurance Company ("CU"), a Massachusetts company, had issued a negotiable All–Risks insurance policy to ASCOP in 1994, and extended it by endorsement in 1995 to shipments by IMF. Accordingly, IMF filed a claim for its loss with CU. By letter dated April 28, 1998, CU denied coverage. This lawsuit followed.

CU's basis for disclaimer, and its third affirmative defense in its Answer, set out an exclusionary clause in the CU policy, the War Exclusion Clause.[1] CU alleged that by reason of this clause, losses caused by police seizure were excluded from coverage.

By Notice of Motion dated July 16, 1999, IMF moved to strike CU's third affirmative defense. After hearing oral argument on December 2, 1999, I granted plaintiff's motion, and confirmed this ruling in a written order dated December 28, 1999. As stated on the record at argument, I held that the plain language of the policy unambiguously excluded from coverage only

---

1. Quoted *infra.*

those seizures resulting from war, and not peacetime seizures resulting from police action.

CU now moves for reconsideration or, in the alternative, for leave to amend its answer and counterclaims to assert a claim for reformation of the insurance contract. I have again considered the motion and, for the reasons which follow, I deny both branches of CU's motion.

## A. The War Exclusion Clause is Unambiguous

■ The policy CU issued to ASCOP was a Marine Open Cargo Policy, providing All–Risks coverage for shipments by ASCOP and, by endorsement, for shipments on order for ASCOP, for example, the IMF shipment in suit. The policy gave ASCOP the right to issue Special Policies covering specific shipments, and embrace those in its underlying coverage. *See* Friedland Aff. Ex. A. The coverage was intended to be broad, covering "all risks of loss of or damage to the subject-matter insured," subject to narrow and enumerated exclusions. *Id.* One exception, identified in bold as a "War Exclusion Clause", provided as follows:

6. In no case shall this insurance cover loss damage or expense caused by

6.1 war civil war revolution rebellion insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power,

6.2 capture seizure arrest restraint or detainment (piracy excepted), or the consequences thereof or any attempt thereat,

6.3 derelict mines torpedoes bombs or other derelict weapons of war.

Friedland Aff. Ex. A.[2]

The meaning of Clause 6 is clear and unambiguous. The risks discussed throughout are war-related risks. The

caption and Subdivision 6.1 plainly say so, and Subdivision 6.1 sets out various species of war; Subdivision 6.2 describes applications or consequences of war affecting insured property; and Subdivision 6.3 extends the exclusion to the after-effects of the detritus of war, i.e., the consequences of derelict mines, topedoes and bombs. I adhere to my holding that the language of the exclusion is unambiguous; that it excludes from coverage only seizures caused by war, and not by peacetime police actions; and that CU's third affirmative defense consequently should be stricken.

CU argues that the custom and usage in the maritime insurance industry relating to the London Institute Frozen Meat Clauses over-rides the clear language of the policy, and that, pursuant to such custom and usage, Subclause 6.2 excludes from coverage any official seizure of cargo, whether in war or peacetime. Inconsistently, CU argues that such custom and usage creates an ambiguity in an otherwise clearly-worded and clearly-captioned clause. CU's argument is contrary to the law of New York which, as I discuss below, is the law governing the contract.

## B. The Plain Meaning of Unambiguous Contract Language Controls

### 1. *Choice of Law.*

The London Institute Frozen Meat Clauses, incorporated by attachment into the CU policy, provided that they be interpreted according to English law. That provision, however, was "canceled and superseded" by a non-numbered clause of the policy issued by CU to ASCOP. This clause provides: "It is hereby understood and agreed that reference to English law and practice is canceled and superseded by U.S. law and practice." Friedland Aff. Ex. A.[3] This policy did not explain what was intended by "U.S. law and practice."

---

**2.** The clause originated as one of the London Institute Frozen Meat Clauses.

**3.** CU's argument that the language regarding U.S. law was removed by two subsequent

amendments of the policy is without merit. It is based on the faulty premise that by "reincorporating" the London Institute Clauses without reiterating the choice of American

■ There is no general federal common law from which "U.S. law and practice" can be determined. *See, e.g., O'Melveny & Myers v. Federal Deposit Insurance Corp.,* 512 U.S. 79, 84, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *Woodward Governor Co. v. Curtiss–Wright Flight Systems, Inc.,* 164 F.3d 123, 126 (2d Cir.1999). As with all cases based on diversity of citizenship, the law of the appropriate American State governs. To find that law, I look to the law of the forum state, that is, to the law of New York, including its conflicts law. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (federal court applies forum state's conflicts law); *Ingersoll Milling Machine Co. v. M/V Bodena,* 829 F.2d 293, 305–6 (2d Cir.1987) (Marine insurance contracts are governed by state law when there is no specifically applicable federal admiralty law ).

■ As with all issues of contract interpretation, New York's conflicts law looks first to the choice of law intended by the parties as expressed in their contract. Since, however, the CU policy did not explain by what state law "U.S. law and practice" should be derived, New York would apply a "center of gravity" approach, evaluating the various contacts of the parties' dealings and transactions to find the most applicable state law. The factors to be considered include the places of contracting, negotiation, and performance; the location of the subject matter that is insured; and the domicile of the parties to the contract. *See Global Financial Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 693 N.Y.S.2d 479, 481, 715 N.E.2d 482 (1999) (holding that New York applies "center of gravity" or "grouping of contacts" analysis to choice of law questions in contract cases); *Allstate Insurance Company v. Conigliaro,* 248 A.D.2d 293, 670 N.Y.S.2d 469, 470 (N.Y.A.D.1998).

■ In this case, the contract was negotiated at least partially in New York, CU signed in New York, and the policy was delivered to ASCOP, a New York company, in New York. The parties intended that, by Special Policy endorsements, negotiable insurance certificates would be created, extending coverage to shippers wherever located, shipping at the instructions of ASCOP, with the insurance to be integral to the financing and documents of title attending the shipments. Thus, the endorsement adding IMF to the ASCOP policy was issued by CU in New York. Moreover, while location of the insured risk may ordinarily be a significant factor in the analysis, it is of marginal importance where, as here, the insured risk, marine cargo, is by nature mobile.

New York is a leading center of banking, commerce and insurance in the United States, and the law developed by its courts is generally recognized and respected in such a light. *See J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 333 N.E.2d 168, *cert. denied* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). As the "center of gravity" respecting this insurance policy, the law of New York should govern the issues of coverage and exclusion and how the clauses of the contract should be interpreted. Shipping companies, shipping from throughout the United States under the indorsement extension of the policy, would naturally look to New York law as the governing law. Principles of negotiability regarding such contracts require a uniform and standard governing law, rather than the adventitious locales

---

law, these endorsements effectively restored the original reference to English law. In fact, these endorsements, which do not mention choice of law at all and deal only with unrelated issues of the scope of coverage, merely identify the London Institute Clauses incorporated in the Open Policy, and each provides:

"ALL OTHER TERMS AND CONDITIONS REMAINING UNCHANGED." Friedland Aff. Ex. A., pp. 486–94. It is clear from this language that the reference to "U.S. law and practice" was not canceled by these amendments.

through which shipment and transit may occur.

### 2. *New York's plain meaning rule for contract interpretation.*

Under New York law, "whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Associates, Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639 (1990). As a question of law, the court is required to review a contract for clarity or ambiguity from its "four corners," in the context of the entire agreement. *See id.; Zodiac Enterprises, Inc. v. American Broadcasting Companies, Inc.,* 81 A.D.2d 337, 440 N.Y.S.2d 240, 242 (N.Y.A.D.1981). "It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assocs.,* 565 N.Y.S.2d at 443, 566 N.E.2d 639 (internal quotation marks omitted); *see also Milonas v. Public Employment Relations Board,* 225 A.D.2d 57, 648 N.Y.S.2d 779, 785 (N.Y.A.D.1996) ("Although ... evidence of custom or usage may be admissible in certain instances to clarify an agreement, this is only the case if the agreement is found to be ambiguous.").

This principle is based on the sound policy that favors predictability in the interpretation of commercial writings. If parties are properly to structure and plan their commercial activities, they must be able to rely upon the plain language of the agreements they sign. A contract is made for the benefit not only of the protagonists who negotiate its terms, but for all who have to deal with it, in that company and with others who deal with the company. A written contract binds future generations of officers and employees, as well as those who took part in its making. *See Telecom International America, Ltd. v. AT & T Corp.,* 67 F.Supp.2d 189, 203 (S.D.N.Y. 1999). To allow parol evidence such as custom and usage to create ambiguity where none exists in the plain language of

the agreement "unnecessarily denigrates the contract and unsettles the law," *W.W.W. Associates,* 565 N.Y.S.2d at 444, 566 N.E.2d 639, threatening to compromise needed "stability to commercial transactions." *Id.* at 443, 566 N.E.2d 639.

New York law and policy also dictates that coverage exclusions must be in clear and unmistakable language in order to be effective, and that ambiguities in such clauses will be resolved against insurers. *See Throgs Neck Bagels, Inc. v. GA Insurance Co. of New York,* 241 A.D.2d 66, 671 N.Y.S.2d 66, 69 (N.Y.A.D.1988). In *Throgs Neck,* a New York appellate court explained: "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation and applies in the particular case...." *Id.* at 71, 671 N.Y.S.2d 66. Policy exclusions, moreover, "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Seaboard Surety Company v. Gillette Company,* 64 N.Y.2d 304, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272 (1984).

New York law thus expresses a strong commercial policy for the plain meaning rule of contract interpretation; that which is stated clearly is to be applied clearly. Thus, the "War Exclusion Clause" is to be interpreted as written, to cover wartime seizures, and not the peacetime seizure of police to interdict blackmarketeers, to apprehend bribe-givers and takers, and to enforce customs laws.

Indeed, the facts in this case raise a particularly compelling argument for the principle that contracts must be enforced in accord with their plain language. IMF, after all, neither negotiated nor signed the underlying insurance policy. IMF, and bankers and counter-parties dealing with IMF, had to rely on the written language of the insurance agreement to understand coverage and exclusions. Where insurance endorsements are negotiable, traveling

with the documents of title and affecting shippers, financing banks and consignees, the New York policies requiring a plain meaning rule of interpreting contract language, and requiring a strict construction for interpreting exclusions to coverage, are particularly compelling.

This well settled principle of New York law was not intended to be modified by the Second Circuit in deciding *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's London,* 136 F.3d 82 (2d Cir.1998). In *Alexander,* the plaintiff, a leading broker for insurance and reinsurance, had purchased an "errors and omissions" policy from defendant. The policy did not cover claims arising from "the financial inability to pay of any insurer or reinsurer with which the Assured has placed or obtained coverage for a client or account." *Alexander,* 136 F.3d at 84. The issue of concern was how to apply the phrase, "client or account." *See id.* at 87. Alexander, the broker, had placed insurance and reinsurance with an insurer which, because of financial incapacity, was placed under rehabilitation under Pennsylvania law. The Pennsylvania insurer had conducted its business through general managing agents, among them, Alexander's subsidiary, Shand, Morahan & Company. The Pennsylvania Rehabilitator sued Alexander and Shand for various errors and neglects in managing and underwriting the Pennsylvania company's insurance business. After hard-fought litigation, Alexander settled, and sued the Lloyd's Underwriters under the Errors and Omissions Policy that Lloyd's had issued to Alexander.

The issue of the lawsuit was whether Alexander's defense and settlement costs were excluded from coverage, whether, that is, the Pennsylvania insurer's financial inability to pay was with respect to coverage placed or obtained "for a client or account" of Alexander, or whether it arose from the alleged underwriting neglects of Alexander's affiliate, Shand Morahan, with respect to business placed with it, as general managing agent, by clients or accounts of other brokers. Alexander argued that Shand was sued, not with respect to its own "clients or accounts", but with respect to business placed with it, as general managing agent, by other brokers for their clients and accounts.

The district judge, interpreting "client or account" simplistically from dictionary meanings, held that the exclusion governed, and gave summary judgment to Lloyd's, dismissing Alexander's complaint. The Second Circuit reversed. In the context of the policy and the circumstances of insurance placement, the Second Circuit ruled, "client or account" was a term of art, and "[d]ictionary definitions" could not be "determinative." *Id.* The "customs or terminology generally understood in the insurance brokerage trade" should be found in order to define if "client or account", in the context of Shand Morahan's errors and omissions for its "clients or accounts", should be extended to business placed with Shand Morahan by other brokers for their clients and accounts. *Id.* The ambiguity, in other words, was not in the meaning of "client or account", but rather whose "client or account" was implicated, how that term should be applied to an errors and omissions policy in the context of a general managing agent functioning with respect to "clients and accounts" of other brokers as well as of its own affiliated companies, and, generally, how to understand that term in the context of a complex state-court litigation arising from the rehabilitation of a failed insurance company.

In arriving at its holding that the competing application of "client or account" presented an ambiguity preventing summary judgment, the court of appeals ruled that the district court should receive evidence as to how that phrase was understood in the industry:

> "An ambiguity exists where the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has

examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."

*Id.* at 86 (internal quotation marks and citation omitted). Only then could the trier of fact decide if the exclusion for "client or account" should be applied to clients and accounts only of Alexander, or if it should be applied as well to clients and accounts of other insurance brokers, produced for Alexander's affiliate, Shand Morahan, as general managing agent of the Pennsylvania insurer.

The ambiguity in *Alexander*, as previously noted, was not in the meaning of "client or account", but in its application to a case of a general managing agent dealing with both its own clients and accounts, and those of other brokers. The ambiguity was inherent in the case setting, in the context in which the policy was to be understood. *See Zodiac Enterprises*, 440 N.Y.S.2d at 242. The court of appeals recognized and accepted New York's traditional rule that "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *See W.W.W. Assocs.*, 565 N.Y.S.2d at 443, 566 N.E.2d 639.

Our case, unlike *Alexander*, does not involve any special context which renders a particular phrase of the contract ambiguous. As the Second Circuit ruled:

"If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence."

*Alexander*, 136 F.3d at 86.

CU cites *Sayers v. Rochester Telephone Corporation Supplemental Management Pension Plan*, 7 F.3d 1091 (2d Cir.1993) and *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182 (2d Cir.1996), but these cases do not support its argument. In *Sayers*, plaintiff, a terminated officer of defendant, signed a retirement agreement by which he agreed not to compete for two years. Plaintiff, as a high-level officer, was also covered by a pension plan which provided that pension benefits would be forfeit if beneficiaries engaged in "any activity inimical to the interests" of defendant during a three-year term following termination of employment. *Sayers*, 7 F.3d at 1093. A third provision, a Rider to the retirement agreement to reconcile the conflict, provided that benefits would not be forfeit if plaintiff were to engage, "directly or indirectly, . . . in any way connected with the development, manufacture or sale of any product or service" if that activity did not violate the non-compete provision of the retirement agreement.

Plaintiff, after two years but before three years, accepted a position as President and Chief Operating Officer of a competitive telephone company, and defendant consequently stopped paying benefits. The court of appeals, reversing the district court, held that the contracts were ambiguous and denied summary judgment. Defendant's argument, that the Rider did not cancel the no-inimical-activity during a three-year period clause of the Pension Plan, and plaintiff's argument, that the Rider limited the non-compete to only a two-year period, were both rationally based on the clauses of the agreement; thus "[b]oth parties offer[ed] interpretations with a sound basis in the language of the two instruments." *Id.* at 1095. The language itself, in other words, supported two different interpretations, and was thus ambiguous. Nothing in the *Sayers* opinion suggests that extrinsic evidence was used to create or find ambiguity, as CU would like to do in our case.

CU quotes *Sayers* for the proposition that "[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally un-

derstood in the particular trade or business." *Id.* (internal quotation marks omitted). This statement of the New York rule, however, does not mean that an ambiguity, not apparent from a fair reading of the contract in its context, can be created by extrinsic or parol evidence, whether that be an alleged custom and usage, or anything else. As the court of appeals stated in *Sayers,* "[I]f ambiguity exists, then extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language." *Id.* (emphasis added and citations omitted). Extrinsic evidence, however, cannot create ambiguity. *See, W.W.W. Associates,* 565 N.Y.S.2d at 443, 566 N.E.2d 639; *Milonas,* 648 N.Y.S.2d at 785.

To the same effect is *Nowak,* which involved a dispute over the meaning of a "break in service" provision in a disability pension plan. In upholding the district judge's finding that the plan language was unambiguous, the Second Circuit again followed the New York rule that parol evidence cannot create ambiguity:

"When the relevant language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion, no ambiguity exists."

*Id.* at 1191 (internal quotation marks and citation omitted); *see also Sayers,* 7 F.3d at 1095 (employing essentially the same language). *Nowak,* like *Sayers,* did not involve extrinsic evidence. CU's argument, that extrinsic evidence may be used to create ambiguity in clear contractual language, is unsupported, and contradicts the New York rule.

## C. Amendment of CU's Answer Would Be Futile

 CU moves in the alternative, under Fed.R.Civ.P. 13(f), for leave to as-

sert a new counterclaim or for reformation of the contract. Rule 13(f) must be read in conjunction with Fed.R.Civ.P. 15(a), which governs motions to amend pleadings, and is governed by the same standard. *See Gabourel v. Bouchard Transportation Co., Inc.,* 901 F.Supp. 142, 144 (S.D.N.Y.1995). Thus, leave to amend is properly denied when amendment would be futile. *See Jones v. New York State Division of Military and Naval Affairs,* 166 F.3d 45, 50 (2d Cir.1999). I hold, in the circumstances presented, that CU's motion for leave to assert a cross-claim for reformation is without merit, and I deny the motion.

 Defendant's motion to reform the insurance policy alleges a mutual mistake. Under New York State law, mutual mistake occurs when "the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." *Chimart Associates v. Paul,* 66 N.Y.2d 570, 498 N.Y.S.2d 344, 347, 489 N.E.2d 231 (1986) (citations omitted). Such motions are not lightly granted, for they present an evasion of the parol evidence rule. And since it presents "the very danger against which the parole evidence rule and the Statute of Frauds were supposed to protect ..., reformation has been limited both substantively and procedurally." *Chimart,* 498 N.Y.S.2d at 347, 489 N.E.2d 231. Parties seeking reformation must tender a high level of proof in evidentiary form. *See id.*

CU argues, based on deposition testimony of ASCOP's insurance broker, Robert Furjanic, that Mr. Furjanic was unaware of differences between the London Institute Clauses quoted earlier, and the "Free of Capture and Seizure" ("FC & S") clause.[4] *See* Daly Aff., Ex. 1 pp. 258–62. The FC & S clause, defendant CU claims, is frequently used in American insurance

---

4. The FC & S clause excludes from coverage "seizure, arrest, restraint, detainment, [and] confiscation ... whether in time of peace or war ...." Def. Mem. Opp'n. p. 8. Mr. Furjanic, testifying about his understanding of the

London Institute clause that he caused to be substituted for the FC & S clause, stated, "I didn't have an understanding.... I understand this to be a war exclusion clause....." Daly Aff. Ex. 1 pp. 258–59.

policies, and excludes coverage for both war and peacetime seizures. Mr. Furjanic's ignorance of the content or meaning of the clauses, however, is not an adequate ground for reformation. If there was error, it was CU's error, proffering a policy with a clause that provided a clear meaning that differed from that which CU would have wanted to tender.

CU's evidence is inadequate to meet the high level of proof required to show mutual mistake. If defendant's argument were to be accepted, the entire purpose of the parol evidence rule would be vitiated. Thus, there is no ground for reformation, and no reason to grant further discovery.[5] Defendant's argument for reformation is denied.

 In the end, we reduce the claims of the parties to a simple commercial proposition. If an insurer wishes to provide an exclusion, the scope of that exclusion is to be understood by its expression. A clause of exclusion may not say one thing and mean another. Here, where the text is not ambiguous, the rights and obligations of the parties are to be determined as a matter of law from the plain text of the "war exclusions clause", no more and no less. The court does not reformulate contracts; it applies them as written, for any compromise from that proposition endangers the objective expectations of parties who must understand and apply what they read from the written word.

## D. Conclusion

For the foregoing reasons, defendant's motions for reconsideration, or in the alternative for leave to assert a new counterclaim, are denied.

SO ORDERED.

---

**5.** Notably, defendant offers no evidence of an understanding on IMF's part, contemporaneous with the extension of the policy to cover

IMF, different from the plain language of the contract.