**NORTH BRANCH RESOURCES, L.L.C., Plaintiff,**

v.

**M/V MSC CALI et al., Defendants.**

**No. 00 CIV. 3054 (JSR).**

United States District Court, S.D. New York.

March 1, 2001.

John McConnell, Purrington & McConnell, New York City, for Plaintiff.

Brendan J. Malley, Mendes & Mount LLP, New York City, for Defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Before the Court are cross-motions for summary judgment by the remaining parties to this case, plaintiff North Branch Resources, L.L.C. ("North Branch") and defendant Cox Dedicated Corporate Member Ltd. ("Cox").[1] On January 29, 2001 the Court telephonically informed the parties that defendant's motion would be denied in its entirety and plaintiff's motion granted in all but one respect. On further review of the applicable English-law precedents, the Court finds that it must grant plaintiff's motion in its entirety.

The relevant facts, either undisputed or (where disputed) taken most favorably to the defendant, are as follows. In April 1999, plaintiff North Branch, a food-exporting company, shipped five containers

1. Summary judgment in favor of the other defendants was granted, on consent, by Order dated December 7, 2000.

of soybean oil to Venezuela, followed in May of that year by a second shipment of nine containers. Both shipments were insured by defendant Cox, a Lloyd's underwriter.

After the five-container shipment arrived in Puerto Cabello, Venezuela on or about April 18, 1999, the vessel discharged the containers into the custody of the Venezuelan Customs Service ("Customs"). Although the contents appeared proper and unharmed, Customs initially held them for re-labeling in accordance with Venezuelan regulations. While this was occurring, one of the five containers was mistakenly reloaded on the vessel and taken to Brazil, from which it did not return until on or about September 21, 1999, when it again was placed in the care of Customs. Meanwhile, Customs refused to release the four remaining containers to the consignee until the fifth container was returned. When the five containers were finally released in October 1999, the consignee discovered that a large number of the soybean oil packages were damaged and promptly notified North Branch on or about October 11, 1999. North Branch, in turn, promptly told Cox of the problem orally, but did not provide written notice until November 19, 1999.

As for the nine-container shipment, it arrived in Puerto Cabello on or about May 16, 1999 and was also turned over to Customs. Again, the contents of the containers appeared unharmed when Customs received them, but upon their release to the consignee, on or about July 3, 1999, many of the oil packages were determined to have been damaged to such a degree that Venezuelan authorities required them to be destroyed. Although the consignee did not notify North Branch of this damage until October 11, 1999 (the same date that it also notified North Branch of the damage to the five-container shipment), defendant has adduced evidence, accepted as true for the purposes of this motion, that North Branch was on notice of at least some of the damage to the nine-container

shipment as early as late June 1999. North Branch, however, did not orally notify Cox of the damage to the nine-container shipment until on or about October 11, 1999 and did not file a written claim until on or about November 21 of that year. Upon Cox's refusal to pay benefits for either shipment, North Branch instigated this lawsuit.

Cox does not dispute the amount of damages to the two shipments, but it asserts three defenses to liability.

■ *First,* Cox contends that since some or all of the damage was seemingly caused or exacerbated by the actions of Venezuelan Customs, coverage is precluded by the insurance contract's "War Exclusion Clause," which reads as follows:

6. War Exclusion Clause. In no case shall this insurance cover loss damage or expense caused by

6.1 war civil war revolution rebellion insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power

6.2 capture seizure arrest restraint or detainment (piracy excepted), and the consequences thereof or any attempt thereat

6.3 derelict mines torpedoes bombs or other derelict weapons of war.

Institute [of London Underwriters] Cargo Clauses (A) ("Cargo Clauses") ¶ 6, Def.'s Ex. 1, Pl.'s Ex. 10 (punctuation as in original). Although no war was in progress, Cox argues that the clause is applicable because Venezuelan Customs "capture[d] seiz[ed] arrest[ed] restrain[ed] or detain[ed]" the containers.

■ On its face, Cox's interpretation appears to wrench the language on which it relies out of context; and, indeed, another judge of this Court, interpreting the identical language under New York law, has held that it applies only to seizures that are war-related. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 98 F.Supp.2d 498, 501 (S.D.N.Y.2000). While in the instant case it is English law that applies,

*see* Cargo Clauses ¶ 19, under English law, as under the New York law applied in *Multifoods,* 98 F.Supp.2d at 503, ambiguities in insurance coverage exclusions must be construed against the insurer. *Zeus Tradition Marine Ltd. v. Bell,* [2000] 2 Lloyd's Rep. 587, 593 (Eng.C.A.); *S. & M. Hotels Ltd. v. Legal & Gen. Assurance Soc'y Ltd.,* [1972] 1 Lloyd's Rep. 157, 161 (Eng.Q.B.); *Bradley v. Essex & Suffolk Accident Indemnity Soc'y,* [1912] 1 K.B. 415, 422 (Eng.); 2 *Chitty on Contracts* § 41–050, at 1009 (H.G. Beale et al. eds., 28th ed.1999). Applying this rule, the Court concludes that a peacetime detention by Customs authorities does not fall within the contract's war exclusion clause.

■ *Second,* Cox contends that coverage is excluded under ¶ 8.1 of the Cargo Clauses, which provides in pertinent part as follows:

> 8.1 This insurance attaches from the time the goods leave the warehouse or place of storage at the place named herein for the commencement of the transit continues during the ordinary course of transit and terminates …
>
> > 8.1.3 on the expiry of 60 days after completion of discharge overside of the goods hereby insured from the overseas vessel at the final port of discharge ….

Cargo Clauses ¶ 8, Def.'s Ex. 1 (punctuation as in original). No matter how this language is construed, it cannot exclude coverage of the damage to the nine-container shipment, since it is undisputed that the Venezuelan authorities determined to destroy the damaged bottles of soybean oil from that shipment no later than July 7, 1999, which is fewer than sixty days after the vessel arrived in Puerto Cabello on May 16, 1999. *See* Pl.'s R. 56.1 Statement ¶ 23; Def.'s Resp. to Pl.'s R. 56.1 Statement ¶ 23.

As to the five-container shipment, however, the question of whether the damage occurred within sixty days of "discharge" is complicated by the inadvertent frolic one container took to Brazil and the concomi-

tant refusal of Customs to release the other four containers until the fifth was returned. As a result, intervening damage to the five-container shipment was not ascertained until on or about October 25, 1999, *see* Def.'s R. 56.1 Statement ¶ 16 & Ex. 4 thereto. Cox argues that this precludes summary judgment on the damage to at least four containers of the five-container shipment, or maybe all five, since the entire shipment arrived in Puerto Cabello on April 18, 1999 and was unloaded at Customs before the fifth container was subsequently reloaded. But the sixty-day limit does not begin to run until "completion of discharge," and in this case the Venezuelan authorities held the entire discharge process in abeyance until the return of the fifth container on September 21, 1999. Since the exclusionary language of the insurance contract must once more be construed against the insurer, *see supra,* the Court concludes as a matter of law that "completion of discharge" of the five-container shipment was not accomplished until September 21, 1999, and that the damage therefore occurred within the coverage period.

■ *Third,* Cox argues that North Branch failed to provide Cox with timely notice of the damage, thus forfeiting the claim. The notice provision on which Cox relies in this respect is set forth in the Certificates of Insurance and states that "In the event of loss or damage which may result in a claim under this insurance, immediate notice must be given to the Lloyd's Agent at the port or place where the loss or damage is discovered in order that he may examine the goods and issue a survey report." As to the five-container shipment, it is undisputed that North Branch gave immediate oral notice but did not provide written notice until more than a month after the damage was discovered. But nothing in the governing English law requires that such notice be in writing unless the contract itself so specifies, and

here it does not. Hence, the oral notice was sufficient.[2]

As for the nine-container shipment, there is a disputed issue of fact as to whether, as North Branch contends, it gave immediate oral notice as soon as it learned of the full extent of the loss, or, as Cox contends, North Branch had knowledge of at least part of the damage some four months earlier but chose not to give notice at that time and must now bear the consequences of its delay. Indeed, it was on the basis of this factual dispute that the Court previously notified the parties that one issue remained for trial.

On further review, however, it is apparent that English law, in contrast to the New York law relied on by Cox, does not regard notice as a condition precedent to insurer liability unless the contract clearly so specifies. Instead, English law presumes that provisions of an insurance contract requiring notice are normally to be read as a basis on which the insurer can reduce or offset damages by showing that if it had received earlier notice it would have been able to take steps to mitigate losses, uncover fraud, and the like. *Cox v. Bankside Members Agency Ltd.*, [1995] 2 Lloyd's Rep. 437, 453–54 (Eng.C.A.); *Alfred McAlpine Plc v. BAI (Run–Off) Ltd.*, [2000] 1 Lloyd's Rep. 437, 441, 443, 445, *dismissing appeal from* [1998] 2 Lloyd's Rep. 694 (Eng.Q.B.); *K/S Merc–Scandia Xxxxii v. Certain Lloyd's Underwriters*, [2000] 2 Lloyd's Rep. 357, 380–81 (Eng.Q.B.); *Taylor v. Builders Accident Ins. Ltd.*, [1997] P.I.Q.R. P247, P251, 1997 WL 1105021 (Eng. Mayor's & City of London Ct.); *cf. Olin Corp. v. Ins. Co. of North America*, 743 F.Supp. 1044, 1053 (S.D.N.Y.1991), *aff'd*, 929 F.2d 62 (2d Cir. 1992) (opposite view under New York law). Here, in particular, the notice provision expressly states that its purpose is to enable the insurer's agent "to examine the goods and issue a survey report." But as to the nine-container shipment, any such survey would have been a complete irrelevancy, since it was the Venezuelan government that ascertained and documented the damage and then confiscated and destroyed the contents. Cox neither disputes this, *see* Pl.'s R. 56.1 Statement ¶ 23; Def.'s Resp. to Pl.'s R. 56.1 Statement ¶ 23, nor makes any claim that inspection by its surveyor could have in any way avoided the consequent loss. In such circumstances, the alleged failure to give prompt notice of the loss to the nine-container shipment does not, under English law, provide any defense to plaintiff's claim.

Accordingly, North Branch's motion for summary judgment is granted in all respects, Cox's motion for summary judgment is denied in its entirety, and the Clerk of the Court is directed to enter final judgment awarding North Branch recovery from Cox in the sum of $43,349.52 and dismissing the case as to all other defendants.

SO ORDERED.

---

**2.** Additionally, the five-container shipment was promptly inspected by an independent surveyor, who confirmed the extent of the damage. *See* Pl.'s R. 56.1 Statement ¶ 11; Def.'s Resp. to Pl.'s R. 56.1 Statement ¶ 11.