**INTERNATIONAL MULTIFOODS CORPORATION, Plaintiff,**

v.

**COMMERCIAL UNION INSURANCE COMPANY and INSURANCE COMPANY OF NORTH AMERICA Defendants.**

No. 98 CIV. 4469(AKH).

United States District Court,
S.D. New York.

Oct. 22, 2001.

White & Case LLP by Paul D. Friedland, Robert E. Tiedemann, New York City, for Plaintiff International Multifoods Corporation.

Bigham Englar Jones & Houston by George R. Daly, Eric D. Suben, New York City, for Defendants/Third–Party Plaintiff Commercial Union Insurance Company,

### MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT

HELLERSTEIN, District Judge.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff International Multifoods Corporation ("Multifoods") moves for summary judgment against Defendant Commercial Union Insurance Company ("Commercial Union").

The issue is whether or not a loss suffered by Multifoods, as an accredited indorsee of an "All Risk" policy written by Commercial Union, was covered by the policy. I hold that the loss was a covered loss, that the policy exclusions do not bar coverage, and that there are no triable issues of fact. Accordingly, I grant Multifoods' motion for summary judgment, and instruct the Clerk to enter judgment in favor of Multifoods and against Commercial Union in the amount of $6,662,557.43, plus interest at the rate of 9% per annum from March 25, 1998 to the date of Judgment.

## I. *The Undisputed Facts.*

In September, 1997, Plaintiff Multifoods, a Delaware corporation principally located in Minnesota, shipped a cargo of frozen meat and foodstuff, from Pascagoula, Mississippi to St. Petersburg, Russia aboard the M/V Ozark, at the order and pursuant to a contract with ASCOP Corporation ("ASCOP"), a New York corporation. Upon satisfactory discharge to the consignee in St. Petersburg, ASCOP was to pay Multifoods $6,056,870.39, the balance remaining after a down payment of $465,802.21.

The ship arrived in St. Petersburg on September 14, 1997, but was unable to discharge Multifoods' cargo. Russian police authorities arrested the ship and its cargo, over Multifoods' objection and incident to a criminal investigation involving a different shipper. Multifoods was not able to recover the cargo or salvage, and made claim against Commercial Union under the policy obtained by ASCOP and indorsed to Multifoods.

### A. *Commercial Union's All–Risk Policy*

The All–Risk Policy, procured by ASCOP from Commercial Union and certified by Commercial Union to Multifoods, comprised 71 pages. Its insuring clauses, exceptions and exclusions were repetitive and inconsistent. The cross-referencing of clauses, from and to indorsements, special indorsements, specimen clauses and appendices increased the difficulty.

The insurance covered Multifoods' shipment from "U.S. Gulf or East Coast Port ...to safe release of tackle at ... St. Petersburg Russia ...." An endorsement extended the coverage to "further transit or period of storage whether prior to, intervening or subsequent thereto," and including "risks whilst in the care, custody or control of ... warehousemen or others ... whether prior to loading and/or after discharge from overseas vessel ...."

This insurance covers the subject matter insured hereby during the whole of the period covered by the duration provisions of the insuring clauses applicable and any further transit or period of storage whether prior to, intervening or subsequent thereto for which provision is made under this contract and irrespective of whether the interest of the Assured is as principals, bailees or agents in any other capacity.

Including risks whilst in the care, custody or control of freight forwarders, consolidators, truckers, warehousemen or others for the purpose of storage, consolidation, decontainerization, distribution redistribution [sic], packing, repacking or otherwise whether prior to loading and/or after discharge from overseas vessel or at any transshipment point. Coverage after discharge from ocean vessel shall terminate on completion of discharge overside from the oversea vessel of the goods insured under this contract to any one port at that port.

The coverage was to remain in force despite delays, "deviation, forced discharge, reshipment or transshipment ... until de-

livery to final destination as eventually established."

> Insurance hereunder remains in force during delay beyond the control of the Assured, any deviation, forced discharge, reshipment or transshipment whether beyond the control of the Assured or otherwise and during any variation of the adventure arising from the exercise of a liberty granted to shipowners or charterers under the contract of the affreightment.

> Where after the attachment of this insurance, the destination is changed by the Assured insurance hereunder shall continue in accordance with the terms of this contract until delivery to final destination as eventually established.

If the assured or consignee refused or was unable to accept delivery, coverage under the Policy continued in effect during delay or return, until "otherwise disposed of."

> In the event of refusal or inability of the Assured or other consignee to accept delivery of the subject matter insured hereunder this contract is extended to cover such goods during delay and/or return and/or otherwise disposed of subject to an additional premium if required. . . .

Further, by an indorsement covering "inland transit", the coverage extended for the property insured "until delivered to the warehouse or store at destination."

Thus, the coverage insured Multifoods against risk of loss to its cargo, not only during the ocean voyage, but continued until delivery at final destination, including delays, deviations and forced discharges.

In case of covered loss, the insured goods were to be valued at "cost and freight plus 10% advance."

The coverage was made subject to conditions, those specifically incorporated from a set of specimen clauses in an annex, "[London] Institute Frozen Meat Clauses (A)—24 Hours Breakdown Cl. 324 (1.1.86)." "All risks of loss of or damage to the subject matter insured," were to be covered, subject only to specific exceptions, those specifically excluded from coverage by "Clauses 4, 5, 6 and 7" of the "Frozen Meat Clauses." As stated in the policy:

> This insurance covers, except as provided in Clauses 4, 5, 6 and 7 below, all risks of loss of or damage to the subject-matter insured, other than loss or damage resulting from any variation in temperature howsoever caused.

Clause 4 excluded from coverage risks arising from the assured's "wilful misconduct," and deterioration and inherent defects in the insured goods or their handling. Clause 5 excluded risks attributable to unseaworthiness. Clause 6 excluded war-risks, a clause that I examined closely in an earlier decision, holding that it did not apply to the conditions at hand, a police action in time of peace. *See International Multifoods Corp. v. Commercial Union Ins. Co.*, 98 F.Supp.2d 498 (S.D.N.Y.2000). Clause 7 excluded losses resulting from strikes and lockouts. Thus, clauses 4, 5, 6 and 7 are not applicable to International Multifoods' loss, and none, therefore, qualifies as an exception to the insuring agreement of the Commercial Union All–Risk policy.

The London Institute Frozen Meats Annex contains additional "specimen" clauses, numbered 8 to 20, relating to, among other matters, duration of coverage, termination of voyage at an unscheduled port, deviation of voyage, conditions of making claims, etc. For the most part, the subjects of these "specimens" are covered by specific clauses of the Policy. Except as thereby covered, the "specimen" clauses are not incorporated into the Policy by any

referencing or incorporating clause, and appear not to be part of the Policy. The Annex also contains, appended to the "specimen" clauses, a "Note" and a "Special Note", the former emphasizing that the Assured should give prompt notice upon becoming aware of a covered event, a subject already covered by the Policy, and the latter providing that "this insurance does not cover loss damage or expense caused by embargo, or by rejection prohibition or detention by the government of the country of import or their agencies or departments . . . ."

"Special Note:-
This insurance does not cover loss damage or expense caused by embargo, or by rejection prohibition or detention by the government of the country of import or their agencies or departments, but does not exclude loss of or damage to the subject-matter insured caused by risks insured hereunder and sustained prior to any such embargo rejection prohibition or detention."

The Special Note is not incorporated into the Policy, or mentioned in any of its clauses.

### B. Indorsement to Multifoods.

The Commercial Union policy contemplated that ASCOP could indorse coverage to its shippers, by Special Indorsements to the Policy. The Special Indorsement that extended coverage to Multifoods was effective as/to all risks attaching on and after June/15, 1985.

### C. The Events of Loss.

The M/V Ozark, having arrived in St. Petersburg on September 14, 1997, discharged the cargo in its "A" hold between September 19 and 24, 1997, belonging to a different shipper. On September 24 and 27, 1997, pursuant to order of the Ministry of Internal Affairs of the Russian Federation, discharge was ordered to stop, and the M/V Ozark and all tangible assets on board were arrested. The Order provided:

Authorized Operative Representative of the Second Department of the ORU of the Northern–Western UVDT of the Ministry of Internal Affairs of the Russian Federation, Captain of the Militia N.B. Urazalin, having reviewed the materials of the criminal case No. 33052 regarding the filing of false documents for the cargo of 8 thousand tons of meat products which arrived to the non-existing firm "ROKS" on board of the m/v "Ozark" without payment of the appropriate customs duties, and taking into consideration that the part of the cargo—meat products were illegally removed from the territory of the Marine Products Port which caused material damage to the government in the form of non-payment of customs duties, and with the aim of providing the safety of the remaining cargo as well as reimbursing the harm caused to the government, guided by Article 175 of the Criminal Procedure Code of the Russian Federation, DETERMINED to: Arrest the m/v "Ozark" and tangible assets on its board.

Following arrest and additional passage of time, the North–Western Transport Prosecutor's Office, over Multifoods' objection, discharged and appropriated Multifoods' cargo from compartments "B" and "C" of the M/V Ozark. Multifoods was not able to recover the cargo, or any part of its value, or effect delivery to the consignee, despite diligent effort.

The cost of Multifoods' cargo, evidenced by the bills of sale to ASCOP, was $6,522,672.60, less a down payment received from ASCOP of $465,802.21, or $6,056,870.39. Adding ten percent, as pro-

vided by the Policy, the claim becomes $6,662,557.43.

On March 25, 1998, Multifoods made claim under the Commercial Union Policy for its insured loss. On April 28, 1998, Commercial Union denied liability, claiming that the seizure and disposal of the goods by the Russian Ministry of Internal Affairs was excluded from coverage by the Policy's War Exclusion clause. This lawsuit ensued.

## II. *Legal Standards*

Summary judgment may be granted if the pleadings and written discovery, together with the affidavits, demonstrate that there is no issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994).

▇▇▇▇ Multifoods, as an all-risk insured, has the burden of establishing a prima facie case for recovery by proving (1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property.[1] *See Farr Man Coffee Inc. v. Chester,* No. 88 Civ. 1692, 1993 WL 248799, at *21 (S.D.N.Y. May 28, 1993). Once Multifoods establishes this prima facie case, "the burden shifts to the [all risk insurer] to prove that the claimed loss was proximately caused by a peril excluded from coverage under the Policy, or from misconduct or fraud on the part of the insured." *Id.* at *29. The all-risk

insurer has the burden to establish "that the only reasonable interpretation of the facts leads to the conclusion that the loss fell within a policy exclusion." *Allied Van Lines Int'l Corp. v. Centennial Ins. Co.,* 685 F.Supp. 344, 346 (S.D.N.Y.1988). If the insurer fails in that burden, coverage is extended. *Id.* And it is not enough if the insurer presses one interpretation of an exclusion clause that favors exclusion, if another interpretation of the facts exists that would not be excluded from coverage. In that situation, the insurer has failed to establish that exclusion results from the *only* reasonable interpretation of the facts, and thus has failed to satisfy the burden imposed by law.

> To avoid coverage, it is not sufficient for the all risk insurers' case for them to offer a reasonable interpretation under which the loss is excluded; they must demonstrate that an interpretation favoring them is the only reasonable reading of at least one of the relevant terms of exclusion. This principle is described by the Second Circuit as a manifestation of the rule of construction contra proferentem. Contra proferentem defines the scope of coverage much as if it were a clause in the all risk policies; experienced all risk insurers must expect the exclusions drafted by them to be construed narrowly against them.

*Holiday Inns Inc. v. Aetna Ins. Co.,* 571 F.Supp. 1460, 1464 (S.D.N.Y.1983) (quotations omitted) (citing *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989 (2d Cir.1974)). As the discussion below makes clear, the insurer has failed to meet its burden, and the insured is entitled to recovery.

---

1. "[A] loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured." *Ingersoll Milling Machine Co. v. M/V Bodena,* 829 F.2d 293, 307 (2d Cir.1987).

### III. *International Multifoods' Prima Facie Case*

There is no dispute as to two of the three elements that Multifoods has to prove in order to recover: the existence of an all-risk policy covering its shipment on the M/V Ozark, and its insurable interest in the subject of that policy. There is also no dispute, with regard to the third element of a prima facie case, that the goods were seized, moved from the ship and appropriated by the Russian police authorities, without Multifoods' consent and over its objection. There is also no dispute that Multifoods was not able to recover the goods or proceeds from their sale or disposition.

▉▉▉▉ I hold, upon the undisputed and indisputable facts and upon the law, that the seizure of the goods aboard ship was the proximate cause of Multifoods' loss. The goods were seized, under suspicion of a customs violation or other criminal violation, and without allegation of fault or wrongdoing on the part of Multifoods.[2] A taking of insured merchandise resulting in permanent dispossession of the shipper or owner is considered to be the cause of loss, even though the actual destruction or disposal of the property may result from some following event. *See Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989 (2d Cir.1974).

In *Pan Am,* the insured's airplane, on a flight from Brussels to New York, was hijacked in the sky over London, flown by the hijackers to Beirut and then to Cairo, Egypt, and subsequently blown up in Egypt. The insurer argued that the wilful destruction of the airplane, not its seizure, caused the loss. The district court held, however, and the court of appeals af-

firmed, that the seizure of the aircraft constituted the covered loss, and not the aircraft's subsequent destruction.

> [W]hen a peril results in the owner's losing control over insured property, any subsequent damage to or loss of the property is attributable to the peril causing the loss of control. In other words, the proximate cause of a loss resulting from a taking followed by destruction is determined by the nature of the taking. While the events immediately preceding the taking may proximately cause a loss, the events following a taking may not.

*Id.* at 1008. "[T]he taking," that is, "characterizes the loss." *Id.*

The same conclusion follows from the language of the Commercial Union policy. The "Duration of Coverage" clause of the Policy provides for coverage "during the whole of the period covered by the duration provisions of the insuring clauses applicable and any further transit or period of storage ... for which provision is made under this contract." The next sentence provides that the coverage extends even if the goods come into the care, custody or control of freight forwarders, consolidators, truckers, warehousemen or others, "whether prior to loading and/or after discharge from overseas vessel or at any transshipment point." The final sentence of these provisions, treating "coverage after discharge from ocean vessel," provides that coverage terminates "on completion of discharge overside from the oversea vessel of the goods insured under this contract to any one port at that port" and, in another section of the policy treating Geographic

---

2. It seems that the alleged customs violations and criminal wrongdoing related to the cargo in the "A" compartment, involving a different shipper. The possible mistake by the Russian authorities, with regard to the status of Multifoods' cargo is not relevant to this lawsuit involving the Commercial Union policy.

Scope, until "safe release of tackle at ... St. Petersburg, Russia."

These clauses, and others in the Policy, manifest an intent, not disputed by any item of proof tendered by the parties, to cover the passage of goods, not only during their ocean voyage, but until the goods are discharged from the ship for the intended consignee. The seizure of the goods by the Russian police authorities prevented discharge to the intended consignee, and was a loss covered by the Policy. Just as in *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co., supra,* the loss occurred when the Russian police authorities seized the goods aboard ship, appropriating them for their own purposes, to the exclusion of both consignor and consignee.

Accordingly, Multifoods has established each of the three elements of a prima facie case: coverage under its All–Risk policy; its insurable interest; and a covered fortuitous loss.

## IV. *Inapplicability of Exclusions from Coverage*

Since Multifoods has made out a prima facie case for recovery, the burden shifts to Commercial Union "to prove that the claimed loss was proximately caused by a peril excluded from coverage under the Policy." *Farr Man Coffee Inc. v. Chester,* No. 88 Civ. 1692, 1993 WL 248799, at *29 (S.D.N.Y. May 28, 1993). Under the Policy, the possible exclusions are limited to four, those stated in clauses 4, 5, 6 or 7 in the London Institute Frozen Food clauses.

**3.** Multifoods was covered also by an excess policy issued by the Insurance Company of North America ("INA"), extending coverage in excess of the Commercial Union policy. The INA policy covered Multifoods for loss beyond the breadth of "the perils and/or definitions and/or limits and/or conditions" of the Commercial Union policy.

Commercial Union focuses on but one: clause 6, the War Exclusion Clause.

In *International Multifoods Corp. v. Commercial Union Ins. Co.,* 98 F.Supp.2d 498 (S.D.N.Y.2000) (*"Multifoods I"*), I closely examined clause 6, and held that its terms clearly and unambiguously limited its exclusion to war-related risks. Accordingly, I struck Commercial Union's defense based on that clause. I held, further, after reviewing the deposition evidence presented by Commercial Union, both before and after argument, that no triable issue was, or could be, presented as to Commercial Union's claimed interpretation of that clause. Objectively understood, the War Exclusion clause does not apply to a peacetime seizure of goods aboard ship by a police authority to enforce a normal police interest in enforcing customs, tax and related criminal laws.

■ Commercial Union, once again arguing that the War Exclusion clause should be interpreted as if it were a free-of-capture-or-seizure ("FC & S") clause,[3] refers this time to a Special Note at the foot of the specimen clauses in the London Institute annex to the Policy. The Special Note states:

> This insurance does not cover loss damage or expense caused by embargo, or by rejection prohibition or detention by the government of the country of import or their agencies or departments, but does not exclude loss of or damage to the subject-matter insured caused by risks insured hereunder and sustained prior to any such embargo rejection prohibition or detention.

The INA policy contained an FC & S exclusion, excluding loss caused by "capture, seizure, arrest... and the consequences thereof..., whether in time of peace or war and whether lawful or otherwise[.]"

Commercial Union argues that the Special Note is a "reminder" to the insured that the War Exclusion clause, clause 6, should be read to exclude peacetime, as well as wartime, seizures and detentions. The Special Note, however, is not part of clause 6, and does not appear near it among the London Institute clauses. The Policy does not incorporate the Special Note, or even refer to it, in any one of the Policy provisions, or in any of its endorsements.

The "Special Note" cannot operate as a backdoor, unmentioned exclusion. It is not part of clause 4, 5, 6 or 7, the only parts of the London Institute specimen clauses that the Policy incorporates as exclusions. There is no indication in any part of the Policy that the specimen clause labeled "Special Note" was intended to be part of the Policy. Indeed, to the contrary, the "Transhipment and/or Reshipment" clause of the indorsement that incorporates relevant clauses of the London Institute annex, provides that the coverage continues even despite a "deviation, forced discharge, reshipment or transhipment [of the goods] whether beyond the control of the Assured or otherwise."

> Insurance hereunder remains in force during delay beyond the control of the Assured, any deviation, forced discharge, reshipment or transhipment whether beyond the control of the Assured or otherwise and during any variation of the adventure arising from the exercise of a liberty granted to shipowners or charterers under the contract of affreightment.
>
> Where after the attachment of this insurance, the destination is changed by the Assured insurance hereunder shall continue in accordance with the terms of this contract until delivery to final destination as eventually established.

No witness in deposition, and no note, memorandum or other document, makes reference to the Special Note, or shows an objective expectation of the insured that it was part of the Policy, rather than one of many "specimens" attached to the policy, some of which were incorporated, and many of which were not incorporated.[4]

Furthermore, Commercial Union argues that an ambiguity has been presented by the Special Note that should cause me to deny summary judgment and order the case to be tried. However, Commercial Union has not presented any material fact to support its contention of ambiguity. Commercial Union, as the respondent to a motion for summary judgment, and as the proponent of a policy exclusion, has the burden to come forward with evidence, and it has failed to do that.[5]

Commercial Union must show, in order to succeed in its argument of ambiguity, that "an interpretation favoring [it] is the only reasonable reading of at least one of the relevant terms of exclusion." *Pan American World Airways, Inc. v. Aetna*

---

**4.** I held in *Multifoods I* that Multifoods could not transform its War Risk Exclusion to an FC & S exclusion by claiming that it had an unexpressed intention to attach an FC & S clause, instead of a War Exclusion clause. Contracts are to be interpreted, I held, according to the objective expectations of the promisee, not the hidden purposes of the promissor. *Multifoods I*, 98 F.Supp.2d at 503–04.

**5.** The testimony of ASCOP's broker, Robert Furjanic, does not say what Commercial Un-

ion argues, and does not inject an ambiguity into an otherwise clear and unambiguous policy. See *Multifoods I*, 98 F.Supp.2d at 506–07. Indeed, it is interesting that Multifoods paid an additional premium for war-risk coverage, thereby purchasing coverage coterminous with the war risk exclusion. It would not have made sense for Multifoods to pay for war-risk coverage if Commercial Union's exclusion provided for something different.

*Casualty & Surety Co.*, 505 F.2d 989, 1000 (2d Cir.1974). Multifoods bargained for and purchased an all-risk policy covering its shipment from Pascagoula, Mississippi to its consignee in St. Petersburg, Russia. It is entitled to the coverage of the Commercial Union policy except if an unambiguous exclusion is shown to be applicable. No such unambiguous exclusion has been shown. As I held in *Multifoods I*, 98 F.Supp.2d at pp. 503–04, a contract is made, not only for the protagonists who negotiated it, but for all who have to deal with that contract, and who must rely on the printed word to evaluate the precise rights, obligations and exclusions provided by a Policy. *See W.W.W. Assoc., Inc. v. Giancontieri*, 565 N.Y.S.2d 440, 443 (1990); *Telecom Int'l Amer., Ltd. v. AT & T Corp.*, 67 F.Supp.2d 189, 203 (S.D.N.Y.1999). This is particularly the case with respect to insurance contracts intended to protect others to whom coverage is extended by indorsement, and their bankers, brokers and counter-parties. Stability of contract interpretation is crucial to the smooth flow of commerce. Accordingly, I hold that the Policy covers Multifoods' loss, caused by the arrest, seizure and appropriation by the Russian authorities of Multifoods' insured merchandise.

## V. *Damages*

The amount of Multifoods' recovery is determined by the Policy: "cost and freight plus 10% advance." The cost, shown by the bills of sale for the cargo and undisputed, is $6,522,672.60, less ASCOP's down payment of $465,802.21, leaving an unrecovered cost of $6,056,870.39. Multifoods paid no freight, and does not claim otherwise. The provision for ten percent adds $605,687.04. Therefore, based on the plain language of the Policy, the valuation of Multifoods' claim is $6,662,557.43. Pursuant to Section 5004 of the New York Civil Practice Law and Rules, Multifoods also is entitled to pre-judgment interest at the rate of 9% per annum beginning on the earliest date on which the cause of action accrued—here, March 25, 1998, the date of Multifoods' claim.

Multifoods' claim for expenses of mitigation, mainly its legal expenses for investigating and seeking recovery of the goods from the Russian authorities, is redundant of the provision in the Policy that adds ten percent to the claim. The provision for a "10% advance", as argued by Commercial Union, was intended to compensate an insured for the normal and reasonable expenses consequent to a loss. Absent a showing by the insured of an extraordinary or unforeseeable expense not adequately compensated by the provision for a "10% advance", and no such showing has been made, Multifoods is not entitled to an additional recovery of its expenses.

The Clerk of the Court is directed to enter judgment for Plaintiff International Multifoods Corporation in the amount of $6,662,557.43, plus interest at the rate of 9% per annum on that amount running from March 25, 1998 to the date of Judgment. All other issues having previously been determined and all other parties having previously been dismissed, the Clerk is directed to close the case.

SO ORDERED.