309 F.3d 76
 INTERNATIONAL MULTIFOODS CORPORATION, Plaintiff-Appellee, and
Indemnity Insurance Company of North America, Defendant-Cross-Defendant-Cross-Claimant-Appellee,
v.
COMMERCIAL UNION INSURANCE Co., Defendant-Cross-Claimant-Cross-Defendant-Appellant, and
Ascop Corporation, m/v Ozark, her engines, boilers, tackle, etc., in rem, Eratira Navigation Co., Ltd., Eastwind Transport Ltd, Van Weelde Chartering B.V., Riomar Agencies, Inc., Roks, LLC, and Astep Corporation, Third-Party-Defendants.
 Docket No. 01-9285.
 United States Court of Appeals, Second Circuit.
 Argued: August 27, 2002.
 Decided: October 17, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED George R. Daly, Joseph A. Yamali, Bigham, Englar, Jones & Houston, New York, NY, for Defendant-Cross-Claimant-Cross-Defendant-Appellant Commercial Union Insurance Co.
 Paul D. Friedland, White & Case LLP, New York, NY, for Plaintiff-Appellee International Multifoods Corp.
 Anthony J. Pruzinsky, Hill Rivkins & Hayden LLP, New York, NY, for Defendant-Cross-Defendant-Cross-Claimant-Appellee Indemnity Insurance Co. of North America.
 Before: CARDAMONE, STRAUB, and KATZMANN, Circuit Judges.
 KATZMANN, Circuit Judge.
 
 
 1
 This diversity action, governed by New York law, arises out of the seizure by Russian governmental authorities of a shipment of frozen food sent by plaintiff International Multifoods Corporation ("Multifoods") to Russia. It raises several issues of contract interpretation with respect to two insurance policies that protected Multifoods against risks associated with the shipment. The District Court granted summary judgment in Multifoods' favor on Multifoods' claim for indemnification against defendant Commercial Union Insurance Company ("CU"), and awarded damages in the amount of $6,662,557.43 plus applicable interest. It granted summary judgment to defendant Indemnity Insurance Company of North America ("IINA") on Multifoods' claim, and CU's cross-claim, seeking indemnification from IINA. For the reasons that follow, we affirm in part and vacate in part the grant of summary judgment to Multifoods, and remand for further proceedings. We affirm the District Court's grant of summary judgment to IINA.
 
 Facts and Procedural Background
 
 2
 In September, 1997, Multifoods shipped a cargo of frozen chicken and meat products from Pascagoula, Mississippi to St. Petersburg, Russia aboard the M/V Ozark (the "Ozark"), pursuant to a $6,522,672.60 contract with ASCOP Corporation ("ASCOP"). The Ozark arrived in St. Petersburg on September 14, 1997. On September 24, 1997 and September 27, 1997, pursuant to an order of the Ministry of Internal Affairs of the Russian Federation, the Ozark and all tangible assets on board were arrested incident to a criminal investigation involving a different shipper. At some point thereafter, the local Russian authorities, over Multifoods' objection, discharged and appropriated Multifoods' cargo from the Ozark. Despite substantial efforts, including oral and written appeals to the Russian government, Multifoods was never able to recover the cargo or any part of its value, nor was it able to ascertain precisely what had happened to the cargo.
 
 
 3
 This litigation primarily centers on whether Multifoods can recover the value of its cargo under an "all-risks" insurance policy (the "CU Policy") procured by ASCOP from CU and certified by CU to Multifoods. The District Court's opinion offers a thorough and detailed canvass of the CU Policy's terms, see International Multifoods Corp. v. Commercial Union Ins. Co., 178 F.Supp.2d 346, 348-50 (S.D.N.Y.2001), and we therefore pause here only to note two provisions of the CU Policy that are essential to the determination of this case, both of which appear in a model boilerplate insurance form — the London Institute Frozen Meat Clauses (A)-24 Hours Breakdown Cl. 324 (1.1.86) (the "London Form") — that was incorporated into (and attached to the back of) the CU Policy.
 
 
 4
 First, Clause 6 (the "War Exclusion Clause") of the London Form, the meaning of which is central to this litigation, provides as follows: 6. In no case shall this insurance cover loss damage or expense caused by
 
 
 5
 6.1 war civil war revolution rebellion insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power
 
 
 6
 6.2 capture seizure arrest restraint or detainment (piracy excepted), and the consequences thereof or any attempt thereat
 
 
 7
 6.3 derelict mines torpedoes bombs or other derelict weapons of war.
 
 
 8
 To the right of Clause 6.1 appears bold language identifying Clause 6 as the "War Exclusion Clause." Second, a "Special Note" at the end of the London Form states that "[t]his insurance does not cover loss damage or expense caused by ... rejection prohibition or detention by the government of the country of import." As we discuss in greater detail below, CU relies upon the War Exclusion Clause and the Special Note to argue that Multifoods' loss is excluded from coverage under the CU Policy.
 
 
 9
 On March 25, 1998, Multifoods made a claim under the CU Policy for the loss of its cargo. On April 28, 1998, CU disclaimed coverage, asserting inter alia that the "coverage terminate[d] upon the discharge of the goods from the overseas vessel" and that the seizure and disposal of the goods by the Russian authorities was in any event excluded from coverage by the War Exclusion Clause.
 
 
 10
 Multifoods then filed this action in the United States District Court for the Southern District of New York (Alvin K. Hellerstein, Judge) to recover the value of its loss from CU. In an oral decision rendered on December 2, 1999, and confirmed by a December 28, 1999 order, the District Court granted partial summary judgment to Multifoods on the War Exclusion Clause issue, holding that the War Exclusion Clause applied only to losses that were incurred in connection with an actual war, and did not exclude coverage for governmental seizures during peacetime. The District Court set forth its reasoning in a June 1, 2000 reported opinion denying CU's motion for reconsideration, International Multifoods Corp. v. Commercial Union Ins. Co., 98 F.Supp.2d 498, 500-06 (S.D.N.Y.2000).
 
 
 11
 Multifoods subsequently filed for summary judgment, arguing that CU had no defense other than the War Exclusion Clause. CU responded by arguing that Multifoods had not as a prima facie matter established that it incurred a "loss" within the meaning of the CU Policy because Multifoods could not prove what had happened to the cargo. In a November 1, 2000 decision rendered orally and confirmed by a written order, the District Court tentatively denied Multifoods' motion for summary judgment, holding that Multifoods had not yet demonstrated as a prima facie matter that it had incurred a "loss" covered by the CU Policy. The District Court ordered additional discovery relating to the circumstances surrounding the seizure of the cargo.
 
 
 12
 Following additional discovery, the parties were unable to determine what had happened to the cargo after its seizure by the Russian authorities, although it became clear that Multifoods had exerted substantial effort in attempting to recover the cargo. At this point, Multifoods again moved for summary judgment. CU argued that material issues of fact about the events in Russia precluded summary judgment. It also at this juncture asserted that the Special Note excluded coverage for Multifoods' loss. In an October 22, 2001 reported opinion, International Multifoods, 178 F. Supp.2d at 348-51, the District Court held that the facts adduced at discovery demonstrated that Multifoods had incurred a compensable loss under the CU Policy and that CU had no defense to Multifoods' claim. It rejected CU's "Special Note" argument, holding that only clauses 4-7 of the London Form were incorporated into the CU Policy as exclusions. International Multifoods, 178 F.Supp.2d at 349-50, 353-55. Accordingly, it granted summary judgment to Multifoods, and awarded full damages under the CU Policy of $6,662,557.43 plus appropriate interest.[1]
 
 
 13
 An additional insurance policy is involved in this litigation. Defendant Indemnity Insurance Company of North America ("IINA") had issued a policy (the "IINA Policy") directly to Multifoods covering, among other things, the Ozark shipment. In the District Court, Multifoods named IINA as a defendant, and CU asserted a cross-claim against IINA arguing that if both CU and IINA were liable for indemnification under their respective policies, IINA should be required to indemnify Multifoods. As a defense to the claims of Multifoods and CU, IINA asserted that the free-of-capture-or-seizure clause (the "FC & S clause") of the IINA Policy barred any recovery. That clause provides that "[n]otwithstanding anything herein contained to the contrary this insurance is warranted free from ... capture, seizure, arrest, restraint ... and the consequences thereof ... (whether in time of peace or war and whether lawful or otherwise") (emphasis added). As we discuss more fully below, Multifoods and CU contended in the District Court that while the FC & S clause would by its terms appear to exclude coverage, it was rendered inapplicable to these facts by other provisions of the IINA Policy. The District Court, however, rejected this argument. In an orally rendered decision confirmed by an order, the District Court granted summary judgment to IINA on this issue, holding that the FC & S clause excluded from coverage the seizure of Multifoods' cargo and dismissing all claims against IINA.
 
 
 14
 On appeal, CU argues that (i) the District Court erred in holding that Multifoods had as a prima facie matter demonstrated that it had incurred a covered "loss" under the CU Policy; (ii) even if Multifoods incurred a covered loss, the District Court erred in holding that neither the War Exclusion Clause nor the Special Note excluded the loss from coverage; and (iii) the District Court erred in granting summary judgment to IINA. Multifoods does not itself appeal the grant of summary judgment to IINA.
 
 Analysis
 I. Standard of Review
 
 15
 Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir.1998). We review a grant of summary judgment de novo, and we, like the District Court, must view "[a]ll facts, inferences, and ambiguities ... in a light most favorable to the nonmovant." Alexander & Alexander, 136 F.3d at 86 (citing Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
 
 
 16
 Under New York law, "the initial interpretation of a contract `is a matter of law for the court to decide.'" K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir.1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir.1996)). The key inquiry at this initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties. "An ambiguity exists where the terms of an insurance contract could suggest `more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Morgan Stanley Group Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir.2000) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir.1997)). If an ambiguity is found, "`the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" Id. at 275-76 (quoting Alexander & Alexander, 136 F.3d at 86). We have explained that "[i]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence" and it may then award summary judgment. Alexander & Alexander, 136 F.3d at 86. Bearing these principles in mind, we turn to the issues raised under the two insurance policies at issue here.
 
 II. The CU Policy
 
 17
 A. Did the District Court Properly Find that Multifoods Had Made a Prima Facie Case that the Loss Fell Within the Scope of the Policy?
 
 
 18
 As the District Court correctly observed, "Multifoods, as an all-risk insured, has the burden of establishing a prima facie case for recovery by proving (1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property." International Multifoods, 178 F.Supp.2d at 350 (citing Farr Man Coffee Inc. v. Chester, 1993 WL 248799, at *21 (S.D.N.Y.1993) (deriving these three requirements from controlling federal and New York law)). In this case, there is no dispute that the CU Policy is an all-risks policy and that Multifoods, by endorsement, has an insurable interest through the CU Policy in the seized cargo. The sole issue is whether Multifoods has suffered a fortuitous loss. CU argues that Multifoods has not demonstrated a fortuitous loss because the evidence does not specifically explain what happened to the goods after the seizure by the Russian authorities and therefore does not prove a "loss." For the reasons that follow, we disagree.
 
 
 19
 The burden on the insured with respect to demonstrating a fortuitous loss under an "all-risks" policy such as the CU Policy is relatively light:
 
 
 20
 All risk coverage covers all losses which are fortuitous no matter what caused the loss, including the insured's negligence, unless the insured expressly advises otherwise. A loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured. An insured satisfies its burden of proving that its loss resulted from an insured peril if the cargo was damaged while the policy was in force and the loss was fortuitous.... All risk open cargo policies ... provide broad coverage for shippers.
 
 
 21
 Ingersoll Milling Machine Co. v. M/V Bodena, 829 F.2d 293, 307-08 (2d Cir. 1987), cert. denied, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988) (internal citation omitted). Multifoods thus needs only to show a fortuitous loss; it need not explain the precise cause of the loss. See In re Balfour MacLaine Int'l Ltd., 85 F.3d 68, 77-78 (2d Cir.1996) ("In order to recover under an all risk policy, the burden of proof is on the insured to prove a fortuitous loss of the covered property. The insured, however, need not prove the cause of the loss.") (internal citations omitted).
 
 
 22
 Here, the issue largely relates to whether Multifoods has demonstrated a loss, rather than to whether such loss should be characterized as fortuitous. We agree with CU (and with the District Court, which made this point through a hypothetical at oral argument, see Joint Appendix at 1817) that the mere seizure of the goods would not by itself have constituted a "loss" triggering coverage under the CU Policy in the sense that coverage obviously would not have been triggered if the cargo had been returned to Multifoods the day after the seizure at little or no cost to Multifoods. However, the fact that Multifoods was unable to recover the goods despite substantial good-faith effort is in our view sufficient to support the conclusion that the seizure of Multifoods' cargo constituted a fortuitous loss within the meaning of the CU Policy-Multifoods' dispossession from the property was never remedied, and resulted in a considerable financial loss to Multifoods. See Pan American World Airways, Inc. v. Aetna Casualty & Surety Co., 505 F.2d 989, 1008 (2d. Cir.1974) ("when a peril results in the owner's losing control over insured property, any subsequent damage to or loss of the property is attributable to the peril causing the loss of control."); Magoun v. New England Marine Ins. Co., 16 Fed. Cas. 483, 485-86 (No. 8,961) (C.C.D.Mass. 1840) (Story, Circuit Justice) (where a vessel and its goods were confiscated by foreign authorities and the vessel was later returned virtually ruined by climate-related deterioration while in the custody of the authorities, the shipper had suffered a "loss" within meaning of insurance policy because "the restraint and detainment under the seizure" rather than "the long delay and exposure to the climate" was "the proximate cause of the loss").
 
 
 23
 In Pan American World Airways, we held that the seizure of an airplane over London by hijackers was the proximate cause of the loss of the airplane, even though the airplane was blown up only after having been flown to Beirut and then to Cairo, and even though the passengers had already left the plane prior to its explosion. Pan American World Airways, 505 F.2d at 1006-09. The present case is distinguishable from Pan American World Airways and Magoun in that the actual destruction or destination of the cargo in this case has never been verified. Nonetheless, we agree with the District Court that the principle of Pan American World Airways controls here to make the seizure the proximate cause of Multifoods' loss. The Pan American World Airways court specifically cited cases which recognize the "principle that the taking characterizes the loss." Id. at 1008. While these cases generally involve a confirmed destruction of the insured property, they recognize that from the perspective of the insured, the real "loss" — if never remedied — is the loss of control that occurs upon a dispossession. Given that there is no dispute that Multifoods lost possession of the cargo upon the seizure by the Russian authorities and given that Multifoods unsuccessfully exerted diligent effort to regain its cargo, the seizure effectively created a loss for Multifoods.[2] We thus partially affirm the District Court's grant of summary judgment to Multifoods, and hold that there is no dispute of material fact with respect to whether Multifoods has established its prima facie claim for indemnity under the CU Policy.
 
 B. The War Exclusion Clause
 
 24
 While we thus agree with the District Court that Multifoods has incurred a "loss" within the meaning of the CU Policy, we respectfully differ with the District Court's holding that there is no dispute of material fact with respect to whether the War Exclusion Clause excludes Multifoods' loss from coverage. For convenience, we once again set forth the text of the War Exclusion Clause:
 
 
 25
 6. In no case shall this insurance cover loss damage or expense caused by
 
 
 26
 6.1 war civil war revolution rebellion insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power
 
 
 27
 6.2 capture seizure arrest restraint or detainment (piracy excepted), and the consequences thereof or any attempt thereat
 
 
 28
 6.3 derelict mines torpedoes bombs or other derelict weapons of war.
 
 
 29
 As noted above, to the right of Clause 6.1 appears italicized language identifying Clause 6 as the "War Exclusion Clause."
 
 
 30
 Multifoods argues that the war-heavy context of Clause 6 and the marginal "caption" make clear that Clause 6 applies only to events occurring during wartime or during one of the other conflicts listed in Clause 6.1. CU, by contrast, contends that Clause 6.2 by its plain terms applies to any governmental seizure of goods, irrespective of whether such seizure occurs during wartime or peacetime. The District Court agreed with Multifoods:
 
 
 31
 The meaning of Clause 6 is clear and unambiguous. The risks discussed throughout are war-related risks. The caption and Subdivision 6.1 plainly say so, and Subdivision 6.1 sets out various species of war; Subdivision 6.2 describes applications or consequences of war affecting insured property; and Subdivision 6.3 extends the exclusion to the after-effects of the detritus of war, i.e., the consequences of derelict mines, torpedoes and bombs.
 
 
 32
 International Multifoods, 98 F.Supp.2d at 501.
 
 
 33
 We share the District Court's view that the fact that the caption titles Clause 6 the "War Exclusion Clause" supports Multifoods' interpretation of the clause. Captions are relevant to contract interpretation. See Mazzaferro v. RLI Ins. Co., 50 F.3d 137, 140 (2d Cir.1995) (internal quotations omitted) ("A contract of insurance must be read as a whole, including any introductory clause or heading, to determine the intent of the parties."). We also agree that the fact that Clause 6.3 proclaims that it deals with "derelict weapons of war" supports the inference that Clause 6 deals exclusively with war-related perils. However, for the reasons that follow, we cannot conclude that the War Exclusion Clause unambiguously applies only to wartime seizures.
 
 
 34
 Although the caption and the content of Clauses 6.1 and 6.3 support Multifoods' argument, several other aspects of the language of the War Exclusion Clause bolster CU's position that Clause 6.2 excludes even peacetime seizures, and at a minimum suggest the existence of an ambiguity. First and most importantly, as noted above, the plain language of Clause 6.2 is global and unqualified. The fact that Clause 6.2 explicitly provides that "[i]n no case shall this insurance cover loss damage or expense caused by ... capture seizure arrest restraint or detainment (piracy excepted), and the consequences thereof or any attempt thereat," is arguably by itself enough to demonstrate that "the terms of [the] contract" at least "suggest," Morgan Stanley, 225 F.3d at 275, that peacetime seizures are excluded. Second, if, as the District Court held, Clause 6.2 "excludes from coverage only seizures caused by war," International Multifoods, 98 F.Supp.2d at 501, it would appear to serve no purpose in light of the fact that Clause 6.1 already excludes from coverage all damage "caused by war civil war revolution rebellion insurrection, or civil strife arising therefrom" (emphasis added). We disfavor contract interpretations that render provisions of a contract superfluous. See Scholastic, Inc. v. Harris, 259 F.3d 73, 83 (2d Cir.2001) (quoting Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094-95 (2d Cir.1993)) ("In determining whether a contract is ambiguous, a court must look at `the entire integrated agreement,' to `safeguard against adopting an interpretation that would render any individual provision superfluous.'"); Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992) (quoting Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 27 (2d Cir.1988)) ("Under New York law an interpretation of a contract that has `the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'"); Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co., 94 N.Y.2d 398, 404, 706 N.Y.S.2d 66, 69-70, 727 N.E.2d 563, 566-67 (2000) ("Bank Leumi's interpretation would render the second paragraph superfluous, a view unsupportable under standard principles of contract interpretation.").[3]
 
 
 35
 Finally, while we agree that the caption supports Multifoods' argument that the War Exclusion Clause applies only to wartime seizures, we note that Multifoods' heavy reliance on the caption is undercut somewhat by the fact that the London Form exclusion clause that immediately follows the War Exclusion Clause contains language broader than implied by its caption. Clause 7 is titled the "Strikes Exclusion Clause." However, while Clauses 7.1 and 7.2 relate to labor strikes, Clause 7.3 excludes "damage caused by any terrorist or any person acting from a political motive." Thus, the Clause 7 caption obviously does not intend exhaustively to subsume the entire scope of Clause 7. This supports CU's view that the "War Exclusion Clause" title merely reflects an attempt to choose a caption that embodies an important theme of the clause rather than serving as an indication that the clause excludes only wartime situations.
 
 
 36
 Hence, while both the caption (read in a vacuum) and the frequent references in Clause 6 to war and to perils that are clearly associated with war support Multifoods' interpretation of the clause, other textual arguments favor CU's interpretation. We must consider the caption in tandem with the actual contractual provisions. See 2 Couch on Insurance § 18:18 (3d ed. 1997) ("While the caption or designation of the type of policy ... does not broaden the coverage expressed in the body of the policy, the policy must be considered as a whole and the caption read in connection with the remainder of the contents" and "[a]n index of the policy's contents forms a part of the contract and should be construed with the detailed provisions of the policy to which it refers"). Given the competing inferences that can be drawn from the language of the CU Policy, we believe that the District Court erred in holding that the War Exclusion Clause unambiguously applied only to wartime seizures. We therefore remand to the District Court for determination of the intent of the parties with respect to the meaning of the War Exclusion Clause. We note that because the contract is facially ambiguous, the District Court may consider any evidence that is probative of the parties' intent, including parol evidence and evidence of custom and usage.[4] See Morgan Stanley, 225 F.3d at 275-76 ("Once a court concludes that an insurance provision is ambiguous, `the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'") (quoting Alexander & Alexander, 136 F.3d at 86).
 
 C. The Special Note
 
 37
 As noted above, an additional issue on appeal relates to the relevance, if any, of the Special Note that appears at the end of the London Form and provides as follows:
 
 
 38
 SPECIAL NOTE: — This insurance does not cover loss damage or expense caused by embargo, or by rejection prohibition or detention by the government of the country of import or their agencies or departments, but does not exclude loss of or damage to the subject-matter insured caused by risks insured hereunder and sustained prior to any such embargo rejection prohibition or detention.
 
 
 39
 CU argues that the Special Note either (i) by itself excludes Multifoods' loss from coverage or (ii) serves to explain that the War Exclusion Clause excludes Multifoods' loss from coverage.
 
 
 40
 We believe that ambiguities exist with respect to the scope, meaning, and force of the Special Note. The language of the Special Note supports CU's interpretation of the CU Policy, providing that "[t]his insurance does not cover loss damage or expense caused by ... rejection prohibition or detention by the government of the country of import."[5] However, the force of the Special Note is very unclear. It does not appear to be an operative provision of the London Form; certainly it is not an "exclusion" in the sense that the War Exclusion Clause is an exclusion.[6] Indeed, Clause 1 of the London Form specifically provides that the insured has "all-risk" coverage subject to "Clauses 4, 5, 6, and 7," which clauses all have captions that describe them as exclusions; there is no reference to the Special Note as an exclusion. The Special Note reads almost like an interpretive comment which could be a useful aid in interpreting the form. However, in the words of the District Court, the CU Policy is a 71-page document, "[i]ts insuring clauses, exceptions and exclusions [a]re repetitive and inconsistent," and "[t]he cross-referencing of clauses, from and to indorsements, special indorsements, specimen clauses and appendices increase[s] the [interpretive] difficulty." International Multifoods, 178 F.Supp.2d at 348. Given this background, it is difficult to determine how much interpretive weight the Special Note should be accorded.
 
 
 41
 At the end of the day, we do not believe that it is possible satisfactorily to determine the relevance or force of the Special Note only on the basis of the CU Policy itself. Resort to extrinsic evidence bearing on the intent of the parties with respect to the force of the Special Note is therefore appropriate, and the District Court should undertake this inquiry in the first instance. On remand, the District Court should view the Special Note as incorporated into the CU Policy as part of the London Form, and should consider all evidence bearing on its meaning, scope, and force as part of the assessment of whether or not the CU Policy excludes Multifoods' loss from coverage.[7]
 
 III. The IINA Policy
 A. Standing
 
 42
 As noted above, CU appeals the grant of summary judgment to IINA on Multifoods' claim, and CU's cross-claim, under the IINA Policy. As an initial matter, IINA argues that CU lacks standing to appeal the grant of summary judgment to IINA. It contends that CU, while styling its appeal as an appeal of a cross-claim, is effectively appealing the dismissal of Multifoods' claim because CU's rights are asserted only as a potential subrogee of Multifoods, and that CU cannot do so because CU lacks privity with IINA and was not adversely affected by the judgment against IINA.[8]
 
 
 43
 It is true that CU's claim is effectively derivative of Multifoods' claim under the IINA Policy. However, under New York law, an insurer has a right in equity to collect a ratable contribution from any other insurer who is also liable for the same loss. See United States Fire Ins. Co. v. Federal Ins. Co., 858 F.2d 882, 885 (2d Cir.1988), cert. denied, 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989) ("The general rule under New York law is that there is a well-settled equitable right to contribution, where there is concurrent insurance....") (internal citations and punctuation omitted); Cosmopolitan Mut. Ins. Co. v. Lumbermen's Mut. Cas. Co., 20 N.Y.2d 145, 153, 281 N.Y.S.2d 993, 996-97, 228 N.E.2d 893, 895 (1967); Tops Markets, Inc. v. Maryland Casualty, 267 A.D.2d 999, 1000, 700 N.Y.S.2d 325, 326 (4th Dep't 1999) ("An insurer has a right to seek contribution from an obligated coinsurer."); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Hartford Ins. Co. of the Midwest, 248 A.D.2d 78, 85, 677 N.Y.S.2d 105, 110 (1st Dep't 1998) ("Where two or more insurers bind themselves to the same risk and one pays the whole loss, the paying insurer has a right of action against his coinsurers for a ratable portion of the amount paid."). CU thus has a significant financial stake in whether IINA can be forced to cover any of Multifoods' loss, and CU thus has a right of action for potential contribution against IINA.
 
 
 44
 IINA argues that CU cannot assert this right until CU has indemnified Multifoods. The caselaw does make clear that the right of contribution ripens only upon indemnification of the underlying obligation. See, e.g., Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 106 (2d Cir. 1992) ("The general rule is that an insurer's right to subrogation attaches, by operation of law, on paying an insured's loss.... At that time, the insurer is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss, and the insurer succeeds to all the procedural rights and remedies possessed by the insured.") (emphasis added). Nonetheless, we do not believe that this concern bars CU's cross-claim here. It is understood that CU's right to collect on its cross-claim is contingent on it being found liable and indemnifying Multifoods; CU's potential liability to Multifoods is unaffected by the resolution of its claim against IINA. As a matter of efficiency and judicial economy, it made sense for CU to raise this issue within these proceedings. We thus reject IINA's challenge to CU's right to appeal the IINA Policy judgment.
 
 B. Merits
 
 45
 However, we affirm the judgment in IINA's favor based on the language of the IINA Policy. As noted above, the IINA Policy contains an FC & S warranty that all parties agree by its terms clearly applies to the seizure in question: "Notwithstanding anything herein contained to the contrary this insurance is warranted free from ... capture, seizure, arrest, restraint... and the consequences thereof... whether in time of peace or war and whether lawful or otherwise." (emphasis added). CU argues that Section 13(a) of the IINA Policy effectively limits the force of the FC & S clause. Section 13(a) provides that
 
 
 46
 [a]ll goods and/or merchandise shipped, except as may be hereinafter especially provided, are insured ... [a]gainst all risks of physical loss or damage from any external cause (excepting risks excluded by the F.C. & S .... warrant[y] unless covered elsewhere herein), irrespective of percentage.
 
 
 47
 (emphasis added). CU contends that the fact that the reference to the FC & S clause is qualified by "unless covered elsewhere herein" means that the FC & S clause excludes only situations that are not specifically included by a different provision of the IINA Policy. It further argues that because Section 29 of the IINA Policy specifically covers "takings at sea, arrests, restraints and detainments of all kings, princes or people of what nation, condition or quality soever," the language of Section 13(a) serves to override the FC & S clause's application to those situations.
 
 
 48
 Because the FC & S clause begins with the phrase "[n]otwithstanding anything herein contained to the contrary," we hold that the District Court properly granted summary judgment to IINA. Such language means that the FC & S clause trumps any other provisions of the IINA Policy. This fact is important because the argument advanced by CU (and by Multifoods in the District Court below) is not without some force; it is virtually impossible to ascribe meaning to the "unless covered elsewhere herein" of Section 13(a) unless one views it as an attempt to limit the scope of the FC & S clause. CU's proposed explanation of the "unless covered elsewhere herein" is problematic because it effectively would eviscerate the FC & S clause entirely. Still, absent the "[n]otwithstanding anything herein contained to the contrary" language of the FC & S clause, the tension between the FC & S clause and the "unless covered elsewhere herein" language arguably would arise to the level of an ambiguity warranting denial of summary judgment. However, because the FC & S clause alone among the relevant provisions applies notwithstanding anything else in the contract, we need not resolve the ambiguities surrounding the purpose of the language of Section 13(a). The FC & S clause by its terms overrides any inconsistent language elsewhere in the IINA Policy. Because the FC & S clause by its terms plainly excludes coverage for the seizure of Multifoods' cargo, and because it trumps all other relevant provisions of the IINA Policy, we affirm the grant of summary judgment to IINA.
 
 C. Sanctions
 
 49
 IINA requests sanctions against CU, arguing that CU is effectively not pressing the appeal because CU devotes (according to IINA) only 21 words of its brief to its appeal against IINA and cites no caselaw. We believe that IINA's request for sanctions is wholly unwarranted. First, IINA's reference to the 21-word argument distorts the attention CU's brief gives to the cross-claim against IINA. That the argument is contained in less than half a page reflects the fact that it is a straightforward argument relying upon the interplay of three different contractual provisions. Those provisions are carefully set forth on a page and a half of the brief, with the effort taken to italicize the language upon which CU relies. The fact that CU cites no cases relating to its appeal against IINA simply reflects the fact its argument here is entirely rooted in the language of the IINA Policy.[9] CU's argument, while ultimately not prevailing, is not frivolous. We therefore deny the motion for sanctions.
 
 Conclusion
 
 50
 For the reasons stated above, we partially affirm the grant of summary judgment to Multifoods insofar as we hold that Multifoods has established a prima facie "loss" within the scope of the CU Policy. We remand, however, for proceedings consistent with this opinion to consider whether either the War Exclusion Clause, the Special Note, or these two provisions in tandem, exclude the loss from coverage. We affirm the grant of summary judgment to IINA.
 
 
 
 Notes:
 
 
 [1]
 The damages award reflected Multifoods' loss of $6,056,870.39 (the balance owed by ASCOP after a $465,802.21 down payment) plus an additional ten percent pursuant to a policy provision providing for 10% extra to cover expensesSee International Multifoods, 178 F.Supp.2d at 355.
 
 
 [2]
 We also note that as a practical matter, the fact that Multifoods' cargo consisted of perishable frozen food guarantees that even in the unlikely event that the cargo is recovered, Multifoods will be unable ever to make commercial use of it
 
 
 [3]
 To be fair, the facts that Section 6.1 itself contains superfluous language (i.e., mentioning "civil war" after unqualifiedly mentioning "war") and that Clause 6.3 appears superfluous regardless of whether or not Clause 6.2 is restricted to wartime suggest that the drafters of the London Form may not have been careful about avoiding extraneous language
 
 
 [4]
 While our determination that the CU Policy is ambiguous rests on the language of the contract, we note parenthetically that the District Court erred in declining to consider the custom and usage evidence that was offered by the parties as part of its assessment of whether an ambiguity existed. InMorgan Stanley, we explained that the question of whether an ambiguity exists is assessed from the viewpoint of "`a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Morgan Stanley, 225 F.3d at 275 (quoting Lightfoot, 110 F.3d at 906) (emphasis added); see also U.S. v. Lennox Metal Manufacturing Co., 225 F.2d 302, 311 (2d Cir.1955) ("it is regarded by many authorities as a fallacy that, in interpreting contractual language, a court may not consider the surrounding circumstances unless the language is patently ambiguous. Any such rule, like all rules of interpretation, must be taken as a guide, not a dictator. The text should always be read in its context. Indeed, text and context necessarily merge to some extent...."). Of course, the line between a contract that is so clear as a matter of ordinary meaning that evidence of industry practice ultimately cannot alter the apparent plain meaning of the language and a contract where industry practice informs interpretation may prove difficult to draw. But that is not to say that evidence of custom and usage is irrelevant to the assessment of whether ambiguity exists.
 
 
 [5]
 Multifoods argues that the Special Note does not describe the events at issue here, contending that the forcible seizure of Multifoods' goods is not a detention, rejection, prohibition, or embargo. However, even though insurance policy exclusions are to be construed narrowly,see Pan American World Airways, 505 F.2d at 999, we are unable to accept the argument that the arrest of a ship and its cargo does not fall within the rubric of a "detention by the government of the country of import."
 
 
 [6]
 Certain language in the District Court's opinion seems to imply that the Special Note was not incorporated into the CU PolicySee International Multifoods, 178 F.Supp.2d at 349-50, 353-55. However, a paragraph entitled "Conditions of Insurance" appears clearly to incorporate the entire London Form: "The subject matter insured shall be insured subject to the following conditions: A.) Frozen Poultry and/or Meat and/or Poultry Products and/or Meat Products. Institute Frozen Meat Clauses (A)-24 Hours Breakdown Cl. 324 (1.1.86)." Indeed, at oral argument, both parties agreed that the entire London Form, including the Special Note, is incorporated into the CU Policy. Thus, we hold that the Special Note is part of the CU Policy.
 
 
 [7]
 The District Court relied in part upon theconfra proferentum rule in construing the Special Note in Multifoods' favor, holding that "Commercial Union must show, in order to succeed in its argument of ambiguity, that `an interpretation favoring [it] is the only reasonable reading of at least one of the relevant terms of exclusion.'" Int'l Multifoods, 178 F.Supp.2d at 354 (quoting Pan American World Airways, 505 F.2d at 1000). While it is true that language in Pan American World Airways would appear to suggest that any ambiguity in an insurance exclusion should be construed against the insurer, see Pan American World Airways, 505 F.2d at 1000, we have made clear that under New York law, courts should not resort to confra proferentum until after consideration of extrinsic evidence. See Morgan Stanley, 225 F.3d at 276 (quoting McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir.1994)) ("`If the extrinsic evidence does not yield a conclusive answer as to the parties' intent,' a court may apply other rules of contract construction, including the rule of contra proferentum, which generally provides that where an insurer drafts a policy `any ambiguity in [the] ... policy should be resolved in favor of the insured.'"); United States Fire Ins. Co. v. General Reins. Corp., 949 F.2d 569, 573 (2d Cir. 1991) (internal quotations omitted) (tracing evolution of contra proferentum rule and noting that New York law has become increasingly reluctant to apply rule except "as a matter of last resort after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument," and commenting that rule is almost never appropriate where contract is between two insures and generally inappropriate if both parties are sophisticated); Kenavan v. Empire Blue Cross And Blue Shield, 248 A.D.2d 42, 47, 677 N.Y.S.2d 560, 563 (1st Dep't 1998) ("Since evidence introduced by the parties extrinsic to the policies was not dispositive of the issue, the IAS court also properly relied on the doctrine of contra proferentum....") (emphasis added).
 
 
 [8]
 IINA also at points in its brief asserts that CU is appealing on behalf of Multifoods, and claims that CU lacks standing to do so. However, CU's District Court answer to the complaint made a claim seeking contribution from IINA in the event it was found liable to Multifoods, and the District Court chose to treat this request as a cross-claim. CU did not clearly style the request for contribution from IINA as a cross-claim. Nonetheless, we believe that the District Court correctly construed it as a cross-claim, and CU has made it clear that it is appealing the District Court's rejection of its cross-claim. The fact that Multifoods has chosen not to appeal its claim against IINA does not bar CU from appealing its own cross-claim. The principal case cited by IINA,Morrison-Knudsen Co., Inc. v. CHG Int'l, Inc., 811 F.2d 1209, 1214-15 (9th Cir. 1987), is inapposite because while one of the defendants in that case was precluded from appealing the dismissal of a plaintiff's claims against a co-defendant, it was permitted to appeal its own claim against that co-defendant.
 
 
 [9]
 The only caselaw that might be relevant would deal with principles of contract interpretation. CU cites numerous such cases earlier in its brief