**40 GARDENVILLE, LLC, Plaintiff,**

v.

**TRAVELERS PROPERTY CASUALTY OF AMERICA, Defendant.**

No. 02–CV–788S.

United States District Court, W.D. New York.

Feb. 9, 2005.

206

Frank C. Muggia, Frank C. Muggia & Associates, PLLC, Orchard Park, NY, for Plaintiff.

Lisa A. Coppola and Stephen A. Sharkey, Rupp, Baase, Pfalzgraf, Cunningham & Coppola LLC, Buffalo, NY, for Defendant.

## DECISION AND ORDER

SKRETNY, District Judge.

### I. INTRODUCTION

In this case, Plaintiff 40 Gardenville, LLC, seeks a declaration that Defendant Travelers Property Casualty Insurance of America is obligated to indemnify it for losses resulting from mold contamination at 40 Gardenville Parkway. Currently before this Court are Defendant's Motion for Summary Judgment and Defendant's Motion for Contempt.

### II. BACKGROUND

**A. Factual Summary**

The following facts are undisputed for purposes of the instant motions, except where indicated. On December 21, 2001, Plaintiff's principals, Gerald Hickson and James Kirchmeyer, purchased a vacant commercial building located at 40 Gardenville Parkway in West Seneca, New York

("the building" or "40 Gardenville"). (Defendant's Rule 56 Statement of Undisputed Material Facts ("Def.'s Statement"), ¶ 11;[1] Hickson Dep. 9:2–8; 18:8–10).[2] To cover any loss to the building, Mr. Hickson procured an all-risk policy of insurance ("the policy") from Travelers. (Def.'s Statement, ¶¶ 5–12; Compl., Ex. A). By its terms, the policy commenced on December 20, 2001 and terminated on December 20, 2002. (Compl., Ex. A). Travelers' underwriter, David Coad, did not inspect 40 Gardenville or arrange for the building to be inspected prior to issuing the policy. (Coad Dep. 15:12–16:23).[3]

The policy provides, in relevant part, "[w]e cover 'loss' commencing during the policy period." (*Id.* at 12). Further, the policy sets forth the following exclusions:

> We will not pay for "loss" caused by or resulting from any of the following . . . (a) Hidden or latent defect, mechanical breakdown or failure . . . or any quality in the property that causes it to damage or destroy itself . . . (b) Corrosion, rust or dampness.

(*Id.* at 18). Lastly, it states "[t]his policy's terms can be amended or waived only by endorsement issued by [Travelers] as part of this policy." (*Id.* at 4).

Prior to purchasing the building, Mr. Hickson and Mr. Kirchmeyer took several steps to determine the viability of the investment. Specifically, they retained Siracuse Engineers to undertake a structural soundness study, Arrow Appraisal to assess the fair market value of the property, and LCS Environmental to perform a "phase one environmental" assessment. (Hickson Dep. 20:1–27:23).

According to Mr. Hickson, Siracuse Engineers, Arrow Appraisal, and LCS Environmental company produced reports setting forth their respective findings. (Hickson Dep. 20:1–27:23). Each company also provided an invoice for services rendered. (Hickson Dep. 20:1–27:23). Mr. Hickson further testified that Arrow Appraisal was a client of Mr. Kirchmeyer and a tenant at 40 Gardenville, and that 40 Gardenville, LLC, may have "bartered" with Arrow Appraisal for services, instead of paying for them. (Hickson Dep. 27:20–29:1).

Before December of 2001, Mr. Hickson inspected the interior of the building between three and eight times, sometimes accompanied by Mr. Kirchmeyer. (Hickson Dep. 18:5–23; 31:2 –16). On one occasion, Mr. Hickson walked through the building with Michael Masters, a representative of BRD Construction, which had been retained to estimate the cost of rehabilitating the building. (Hickson Dep. 29:3–31:1). Mr. Hickson testified that he observed leaks in the roof and large holes on the exterior walls, water draining into buckets and leaking from the open valve of the sprinkler system, puddles of standing water, and wet carpeting throughout the building. (Hickson Dep. 33:10–37:23;

---

1. Plaintiff did not respond to Defendant's Statement of Undisputed Material Facts. *This Court finds that the facts contained in Defendant's Statement are clearly supported by unrefuted documentation in the record. As such, it is unnecessary to deem these facts admitted strictly by operation of Rule 56.1(c) of the Local Rules of Civil Procedure for the Western District of New York, which provides that facts contained in the moving party's Rule 56 Statement are deemed admitted unless controverted by the opposing party.*

2. Relevant portions of Mr. Hickson's deposition testimony are attached as Exhibit C to the Appendix to Defendant's Statement of Undisputed Material Facts.

3. Relevant portions of Mr. Coad's deposition testimony are attached as Exhibit K to the Supplemental Appendix to Defendant's Statement of Undisputed Material Facts.

42:9–43:3). He was advised, presumably by Mr. Masters, that the entire roof would have to be replaced. (Hickson Dep. 34:2–4). Mr. Hickson also observed a substance resembling dirt on the vinyl baseboards along the second floor that he later learned was mold. (Hickson Dep. 59:4–60:22). Specifically, he offered the following testimony regarding this substance:

Q: Did you see any mold in the building before closing?

Hickson: We—I saw something at the base which I thought was dirt, now since somebody came in and· said it's mold, now I know it is mold.

Q: The base of what, what did you see that looked like dirt?

Hickson: At the base of the—I don't know what they call it.

Mr. Muggia: Base board.

Hickson: Base boards, like a vinyl base board.

Q: Right. What floor are we talking about?

Hickson: Second.

Q: Okay.

Hickson: I believe it's the second.

(Hickson Dep. 59:4–59:17).

According to Mr. Masters and BRD's construction log, BRD Construction did nothing to stop water from further infiltrating the building until March or April of 2002, when they began repairs on the roof. (Masters Dep. 30:6–34:23; App. Def.'s Statement, Ex. F).[4] On May 2, 2002, BRD Construction ceased all work on 40 Gardenville when they discovered evidence of mold contamination. (Compl., ¶ 10).[5] They advised Mr. Hickson and Mr. Kirchmeyer that same day that extensive mold remediation would be required. (Compl., ¶¶ 11, 16). On May 10, 2002, 40 Gardenville, LLC, reported to Travelers that the building was contaminated with mold. (Compl., ¶ 12). A representative from Travelers inspected the property on May 23, 2002, and requested additional information regarding the mold contamination on June 12, 2002. (Compl., ¶¶ 13, 14). Ultimately, Defendant denied Plaintiff's claim for mold loss on the basis that the policy does not provide coverage for losses commencing before the policy period or for losses caused by dampness. (Compl., ¶ 18).

## B. Procedural History

Plaintiff commenced this lawsuit on October 22, 2002, by filing a Summons and Complaint in Erie County Supreme Court. (App. Def.'s Statement, Ex. A). Defendant filed a Notice of Removal and Answer in the United States District Court for the Western District of New York on November 12, 2002. (Docket Nos. 1 & 2).

On December 30, 2003, Defendant moved for an order compelling Plaintiff to disclose the report rendered by Arrow Appraisal prior to the purchase of the building, which Mr. Hickson referred to during his deposition. By Order entered on April 22, 2004, the Honorable Hugh B. Scott, United States Magistrate Judge, directed Plaintiff to disclose all appraisal and inspection reports within thirty days, finding that the reports were relevant to the issue of when mold was detected on the property. (Docket No. 55). On May 24, 2004, Plaintiff's counsel advised Defendant by letter that "my clients have confirmed that they did not retain Arrow Appraisal on this transaction." (Sharkey Aff. in Supp.

---

4. Relevant portions of Mr. Master's deposition testimony are attached as Exhibit E to the Appendix to Defendant's Statement of Undisputed Material Facts.

5. The Verified Complaint is attached as Exhibit A to the Appendix of Defendant's Statement of Undisputed Material Facts.

of Contempt, Ex. H). Instead of the Arrow Appraisal report, Plaintiff provided a copy of an appraisal report prepared by Emminger, Hyatt, Newton & Pigeon, Inc. (Sharkey Aff. in Supp. of Contempt, Ex. I). According to this report, Emminger's representative inspected the building on February 25, 2003, more than one year after its purchase, and prepared the report exclusively for Jamestown Savings Bank. (Sharkey Aff. in Supp. of Contempt, Ex. I). Plaintiff's counsel represented that the Emminger report is "the only [appraisal] known by my client." (Sharkey Aff. in Supp. of Contempt, Ex. I).

On April 13, 2004, Defendant filed a Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[6] Thereafter, on June 9, 2004, Defendant moved for an order of contempt against Plaintiff for failing to comply with Judge Scott's April 22, 2004 Order. As a sanction, Defendant seeks a declaration that the mold contamination at 40 Gardenville predated the inception of the policy.[7] This Court heard oral argument on September 16, 2004, and reserved decision at that time.

## III. DISCUSSION

### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.*

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). Ultimately, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

### B. Defendant's Motion for Summary Judgment

Plaintiff seeks a judgment declaring that Travelers is obligated to indemnify 40 Gardenville, LLC, under the policy for all mold, mold remediation, and mold related expenses. Defendant moves for summary judgment on the basis that the claimed

---

6. In support of its Motion for Summary Judgment, Defendant filed a memorandum of law, an affidavit by Laurence Malloy, a statement of undisputed material facts, an appendix thereto, a reply memorandum of law, an affidavit by Ronald McMillan, an affidavit by Stephen A. Sharkey, a reply affidavit by Laurence Malloy, and a supplemental appendix to its statement of undisputed material facts. Plaintiff filed a notice of opposition, a memorandum of law, an affidavit by Raj Chopra, and an affidavit by Frank C. Muggia in opposition to the Motion.

7. In support of its Motion for Contempt, Defendant filed an affidavit by Stephen A. Sharkey with exhibits, a memorandum of law, and a reply affidavit. Plaintiff filed an affidavit by Gerald Hickson, and a memorandum of law in opposition to the Motion.

loss is not covered under the policy. Specifically, Travelers argues that the mold loss was not a fortuitous loss and that it is expressly excluded from coverage by the terms of the policy. This Court will address each argument in turn.

### 1. Fortuitous Loss and Known Loss

▮▮▮ To establish a prima facie case for recovery in New York State, an all-risk insured must prove: "(1) the existence of an all-risk policy; (2) an insurable interest in the subject of the insurance contract; and (3) the fortuitous loss of the covered property." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir.2002). In establishing a "fortuitous loss," Plaintiff must show that the damage sustained to the insured property was caused by a "fortuitous" event within the meaning of the policy. *525 Fulton St. Holding Corp. v. Mission Nat'l Ins. Co.*, 256 A.D.2d 243, 682 N.Y.S.2d 166, 166 (1st Dep't 1998). New York courts have construed the term "fortuitous event" to mean an event "happening by chance or accident." *80 Broad St. Co. v. United States Fire Ins. Co.*, 88 Misc.2d 706, 389 N.Y.S.2d 214, 215 (1975) (internal citations omitted). As such, losses that result from inherent defects, ordinary wear and tear, or intentional misconduct of the insured do not constitute fortuitous losses. *Int'l Multifoods*, 309 F.3d at 83.

▮▮▮ "Broadly stated, the fortuity doctrine holds that insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Companies, Inc.*, 265 F.3d 97, 106 (2d Cir.2001) (internal quotations and citations omitted). As applied, the fortuity doctrine prevents insurers from having to pay for losses arising from undisclosed events that existed prior to coverage, as well as events caused by the manifestation during the policy period of inherent defects in the insured property that existed prior to coverage. *80 Broad Street Co.*, 389 N.Y.S.2d at 215 (citing *Greene v. Cheetham*, 293 F.2d 933, 936–37 (2d Cir.1961)). Both federal and state courts in New York recognize the value of preventing recovery for such losses:

> The policy rationale for the fortuity doctrine is simple. When parties enter into an insurance contract, they are, in effect, making a wager as to the likelihood that a specified loss will occur. (internal citations omitted). If the loss has already occurred, or the insured knows that the loss is certain to occur for reasons not disclosed to the insurer, then the insurance contract is not a fair bet.

*CPH Intern., Inc. v. Phoenix Assur. Co. of New York*, No. 92 Civ. 2729(SS)(NRB), 1994 WL 259810, at *6 (S.D.N.Y. June 9, 1994); *Chase Manhattan Bank v. New Hampshire Ins. Co.*, 193 Misc.2d 580, 749 N.Y.S.2d 632, 639 (N.Y.Sup.Ct.2002).

▮▮▮ The "known loss" defense is a variation on the fortuity doctrine. *Nat'l Union*, 265 F.3d at 106. In New York, the "known loss" defense precludes an insured from recovering for losses that existed prior to the inception of a policy and that were known to the insured. *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1214 (2d Cir.1995), *modified on other grounds*, 85 F.3d 49 (2d Cir.1996) (holding that "an insured may not obtain insurance to cover a loss that is known before the policy takes effect"); *see also Henry Modell & Co. v. Gen. Ins. Co. of Trieste & Venice*, 193 A.D.2d 412, 597 N.Y.S.2d 75, 75 (1st Dep't 1993) (holding that losses which occurred more than eight months before the commencement of the policy, and were known to the insured, were not covered under the insurance policy).

■ In the instant matter, it is undisputed that the policy is an all-risk policy and that 40 Gardenville, LLC, has an insurable interest in the building. The sole inquiry is whether 40 Gardenville, LLC, has suffered a "fortuitous" loss within the meaning of the policy. This necessarily requires a trier of fact to determine whether Plaintiff's principals knew when they procured the policy from Travelers that the mold contamination existed or was substantially certain to occur. This determination cannot be made on the record before this Court.

Defendant argues that the mold contamination predated the inception of the policy and that Mr. Hickson was aware of the problem based on his inspection of the building prior to its purchase. This argument is unavailing. Mr. Hickson did admit that prior to purchasing the building, he observed a substance on the baseboards of the second floor that he later learned was mold. (Hickson Dep. 59:4–60:22). While this admission certainly supports Defendant's position that mold existed in the building prior to the inception of the policy, it does not compel the conclusion that Mr. Hickson was aware of the mold contamination at that time. Nor does Mr. Hickson's knowledge that water had infiltrated the building establish that he knew that these damp conditions presented a certain risk of mold contamination. Drawing all reasonable inferences in favor of Plaintiff, this Court finds that there is a genuine issue as to whether Plaintiff's principals knew at the time they procured the policy from Travelers that the building was contaminated with mold or was certain to become contaminated with mold. As such, this Court declines to grant summary judgment on the basis that the mold loss or the risk of loss was known to Plaintiff.

## 2. Dampness Exclusion

■ Under New York law, insurance policies, like other contracts, must be construed so as to give effect to "the intent of the parties as expressed by their words and purposes." *Nat'l Union*, 265 F.3d at 103 (quoting *In re Prudential Lines Inc.*, 158 F.3d 65, 77 (2d Cir.1998)). As such, "[u]nambiguous terms are to be given their plain and ordinary meaning," and "ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract." *Id.* Generally, interpretation of an insurance policy is a legal question. *Nat'l Union*, 265 F.3d at 104. However, if a policy contains ambiguous language, which can only be resolved by considering contested extrinsic evidence, interpretation becomes a question of fact. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Companies, Inc*, No. 98 Civ. 8428(DLC), 1999 WL 1267461, at *3, (S.D.N.Y. Dec. 29, 1999).

■ Under New York law, "ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Int'l Multifoods*, 309 F.3d at 83 (citing *Morgan Stanley Group Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir.2000)) (internal quotations omitted). Ambiguity does not exist " 'simply because the parties urge different interpretations.' " *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001) (quoting *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

■ "[W]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so 'in clear and unmistakable' language." *Simplexdiam, Inc. v. Brockbank*, 283 A.D.2d 34, 727

N.Y.S.2d 64, 67–68 (N.Y.App.Div.2001) (citing *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 486 N.Y.S.2d 873, 476 N.E.2d 272, 275 (1984)). If an exclusion provision is specific and clear, it is accorded a strict and narrow construction and given its ordinary meaning. *Seaboard Surety Co.*, 486 N.Y.S.2d 873, 476 N.E.2d at 276; *Gerber v. Government Employees Ins. Co.*, No. 94 CIV. 1267(MBM), 1994 WL 682453, at *1 (S.D.N.Y. Dec. 1, 1994) (citing *Cue Fashions, Inc. v. LJS Distrib., Inc.*, 807 F.Supp. 334, 336 (S.D.N.Y.1992)).

▮▮▮▮ In determining whether a particular exclusion contained in an insurance policy applies, courts must focus on the proximate cause of the claimed loss. *See Kimmins Indus. Service Corp. v. Reliance Ins. Co.*, 1993 WL 667308, at *3 (W.D.N.Y. 1993). Ultimately, "the insurer shoulders the burden of demonstrating that the loss claimed is excluded expressly from coverage under the policy terms." *Id.* at ——, 1993 WL 667308, *4 (quoting *M.H. Lipiner & Son, Inc. v. The Hanover Ins. Co.*, 869 F.2d 685, 687 (2d Cir.1989)). This Court finds that Defendant Travelers has carried this burden.

▮▮▮ In pertinent part, the Travelers policy provides: "[w]e **will not pay for 'loss' caused by or resulting from any of the following** ... (b) Corrosion, rust or dampness." (Compl., Ex. A, p. 18) (emphasis added). In the view of this Court, it cannot be said that this language is ambiguous. As such, the term "dampness" must be accorded its plain and ordinary meaning, to wit, "wetness" and/or "moistness." See THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed.2000).

It is undisputed that, prior to the inception of the policy, substantial amounts of water had infiltrated the building through the leaking roof, saturated the carpets, and pooled into puddles on the floor of the building. Plaintiff's principal, Mr. Hickson testified at length about the leaks in the roof and the building's piping, the wet carpeting, and the water that had collected into puddles on the floor. (Hickson Dep. 33:10–37:23; 42:9–43:3). These conditions were corroborated by Mr. Masters of BRD Construction, Plaintiff's contractor, who observed "roof leaks in various locations" in the building, and the presence of dampness and standing water on both floors during his initial walk through. (Masters Dep. 11:5–20).

It is also undisputed that water caused the mold contamination at 40 Gardenville. Defendant's expert, Laurence B. Malloy, a certified mold assessor, set forth the following information in his report evaluating the mold loss in the building: "Moisture in a building is the key indicator of fungi contamination. Moisture caused by leaks and seepage is the primary cause of mold growth in buildings, followed by floods and fires. The most common and widely distributed molds grow vigorously on paper, wood, paint, leather and fabric that contains 12% to 15% water." (Malloy Aff., Ex. B, p. 2). Further, Mr. Malloy opined that "the mold [at 40 Gardenville] was caused by moisture and dampness present in the building from a leaking roof." (Malloy Aff., ¶ 4).

Plaintiff's expert, Raj Chopra, does not dispute that the water, which had infiltrated the building, caused the mold contamination. Mr. Chopra offered the following general information about mold growth in his January 22, 2002 report: "The main fuel required for mold growth is water. Water can be introduced into a building structure in many ways including roof leak [sic], broken pipes, floods and condensation. The first step in controlling mold growth is to determine the source of the water and stop the infiltration." (Chopra

Aff., Ex. B, ¶ 4). In Mr. Chopra's opinion, "the mold contamination at 40 Gardenville was a result of a number of conditions including, (1) the building had been left vacant, (2) the HVAC system was not operating, causing condensation throughout the structure, and (3) the roof was leaking." (Chopra Aff., ¶ 8).

Based on the foregoing, this Court finds the water or dampness present in the building was the proximate cause of the mold contamination. As such, the unambiguous language of the policy excluding coverage for losses caused by or resulting from dampness applies to Plaintiff's claim for mold loss, and operates as a bar to Plaintiff's recovery in this matter. For these reasons, Defendant's Motion for Summary Judgment will be granted.

### 3. Motion for Contempt

As previously noted, Defendant has moved for an order of contempt based on Plaintiff's failure to produce, pursuant to Judge Scott's April 22, 2004 Order, the report rendered by Arrow Appraisal prior to Plaintiff's purchase of the building. This Court finds that Mr. Hickson's belated statement that he was "mistaken that Arrow Appraisal had done the appraisal for 40 Gardenville, LLC," is not credible in light of his prior testimony. (Hickson Aff., ¶ 1). At his deposition, Mr. Hickson testified definitively that Arrow Appraisal had appraised the building before he purchased it, that he possessed a copy of the appraisal report setting forth the building's fair market value, and that he was invoiced for Arrow Appraisal's services. (Hickson Dep. 27:7–29:2). He also testified that Arrow Appraisal was a client of Mr. Kirchmeyer's and a tenant at 40 Gardenville, and that 40 Gardenville, LLC, may have bartered for Arrow Appraisal's services, instead of paying for them. (Hickson Dep. 27:7–29:2).

This Court does not credit Plaintiff's assertion that the only known appraisal on the building was executed by Emminger, Hyatt, Newton & Pigeon, Inc. The Emminger appraisal was conducted on February 25, 2003, exclusively for Jamestown Savings Bank. (Sharkey Aff. in Supp. of Contempt, Ex. 1). As such, Mr. Hickson could not have relied on the Emminger report in determining whether to purchase the building in December of 2001.

As a sanction for Plaintiff's non-disclosure, Defendant seeks a declaration that the mold contamination at 40 Gardenville predated the inception of the policy. Such a declaration is unnecessary in light of this Court's determination that Defendant is entitled to summary judgment based on the policy exclusion. Accordingly, Defendant's Motion for Contempt is denied as moot.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted and Defendant's Motion for Contempt is denied as moot.

### V. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 49) is GRANTED.

FURTHER, that Defendant's Motion for Contempt (Docket No. 67) is DENIED as MOOT.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.